Justice Laurie McKinnon delivered the Opinion of the Court.
***7 ¶1 A jury in the Thirteenth Judicial District Court, Yellowstone County, convicted Patrick Neiss of evidence tampering and deliberate homicide for the murder of his neighbor, Frank Greene. Neiss appeals, raising three issues:
1. Did the District Court properly deny Neiss's motion to suppress evidence seized pursuant to a search warrant that did not explicitly authorize a no-knock entry?
2. Did the District Court properly deny Neiss's motion to suppress evidence obtained through a forensic search of his computer?
3. Did the District Court abuse its discretion by instructing the jury to choose the "most reasonable" interpretation of circumstantial evidence when there are two competing interpretations-one that supports innocence and one that supports guilt?
¶2 We affirm.
FACTUAL AND PROCEDURAL BACKGROUND
¶3 What began as a friendship between neighbors founded on a mutual love of cars grew increasingly bitter after Neiss began to suspect Greene had stolen his prized Camaro motor. Neiss's motor went missing in 2007, but beginning around 2011, Neiss became convinced Greene had stolen it. Neiss spoke often about the stolen motor and his suspicions of Greene, and he was "pretty much obsessed with it" as witnesses would later testify. Between 2011 and 2013, the two men had several disagreements and altercations regarding the motor. Neiss became openly hostile toward Greene, even telling his girlfriend at the time that he would like to "shoot" Greene. In September 2012, Neiss told a deputy county sheriff that he considered the sheriff's office to be accomplices of Greene and was angry they had never located the stolen motor. Around the same time, Neiss moved a large water tank to the top of a hill overlooking Greene's property and spray-painted the word "MOTOR" on it in red paint.
¶4 The situation continued to escalate when, during the fall of 2012, Neiss angrily confronted Greene's cousin about the motor. Greene's cousin told Neiss he did not want to become involved with the ongoing dispute, and Neiss responded "you got two weeks." Around February 2013, one of Greene's friends heard Neiss yell expletives at Greene as he drove by Greene's home. On March 7, 2013, another neighbor of Greene's overheard Greene heatedly arguing with an unidentified person. The next day, Greene's girlfriend, Manda Schaible, who lived with Greene at the time, found him in his shop, lying face down in a pool of blood. He had been shot and killed.
¶5 Schaible called 911 immediately. She told the dispatcher Neiss ***8 could have been Greene's murderer but she was unsure. About two or three minutes into the call, she saw Neiss's Chevy pickup slowly drive by her home.
¶6 Officers arrived at the scene shortly after. Although they never located a murder weapon, they found five .40 caliber shell casings and what appeared to be fresh shoeprints *442 in the soil near Greene's shop leading to and from the direction of Neiss's property. Officers then located and detained Neiss at a nearby gas station.
¶7 A few days later, Detective Shane Bancroft applied for a search warrant for Neiss's property (March 2013 Warrant). In the warrant application, Detective Bancroft included detailed information connecting Neiss to Greene's death, including evidence from the crime scene investigation, witness statements, prior police reports, and court records. Detective Bancroft stated he had probable cause to believe officers would find evidence on Neiss's property of deliberate homicide and-because officers were unable to locate the murder weapon-evidence tampering. Detective Bancroft believed officers would find evidence including firearms, ammunition, spent shell casings, silencers, biological material, and shoe impressions consistent with those found at the crime scene. Detective Bancroft also described the following items as potential evidence: "[c]ell phones, IPads, computers and/or other electronic devices and the information contained therein"; and "[i]ndicia of Occupancy/Ownership in the form of documents, receipts, statements, mail, billing statements, letters, notes, [and] vehicle registration/titles." Noting the violent nature of the crime, the known prior altercations between Neiss and Greene, Neiss's belief that deputy sheriffs were Greene's accomplices, and a prior federal firearms conviction Neiss received in 2000, Detective Bancroft also requested authorization to execute a no-knock entry-an exception to the knock-and-announce warrant execution requirement. While the ultimate warrant signed by the judge provided for seizure of the evidence Detective Bancroft listed, it left out any authorization for a no-knock entry.
¶8 At 4 a.m. on March 14, 2013, officers executed the search warrant at Neiss's property with SWAT team assistance. Neiss's property was large and had a long gravel road leading to his home, which the officers drove across with their vehicle lights off under the cover of darkness. After parking the vehicles, multiple SWAT team members exited them and stealthily approached Neiss's house. Then, over the course of twelve-to-fifteen seconds, the SWAT team entered Neiss's sunporch, deployed a flashbang device outside his front door, and entered his home, all while sheriff's deputies outside Neiss's residence activated ***9 their vehicle lights and announced their presence over their loudspeakers.
¶9 After they gained entry to Neiss's home, the officers executed the search warrant. The officers seized multiple items from Neiss's home and the surrounding area, including three computers and numerous .40 caliber shell casings. The officers did not search the information on the computers at that time.
¶10 On August 12, 2014, officers received a warrant for Neiss's arrest and a warrant for a second search of Neiss's residence.[1] Officers located an item thought to be a silencer for a firearm. The item appeared to be the body of a Maglite flashlight with gunshot residue coating its interior. On May 15, 2015, nearly one year after his arrest and two years following the March 2013 seizure of his computers, Neiss filed a motion to suppress the results of the March 2013 search, arguing the warrant lacked probable cause and officers failed to knock and announce their presence before executing it. On July 22, 2015, the District Court issued an order denying the motion. Following seizure of Neiss's computers in March 2013 and continuing until the District Court's July 2015 order, Neiss's computers were in the possession and control of law enforcement, who did not search or otherwise disturb their contents. Law enforcement kept the computers in a manner that protected them from any physical tampering or environmental degradation. While still lawfully in possession of the computers, officers applied for a third search warrant on August 12, 2015-this time to search the computers themselves. Detective Shane Bancroft applied for the warrant and averred, in pertinent part, as follows:
During the search of the residence on March 14, 2013, Investigators noted computer printouts that would indicate that *443 someone had been actively using the computer. Additionally, Investigators were aware that on at least one occasion the Defendant had written a letter to himself that detailed his history with Greene. While the letter was handwritten; Investigators thought it was possible that Neiss may have kept a journal or log of events on one or more of the computers.
Finally, during a subsequent search of the property at 7200 Central Avenue on August 12, 2014 (pursuant to a Search Warrant signed by Judge Todd earlier in the day), Investigators located an item we thought could possibly have been used as a silencer. The item was what appeared to be the body of a mag ***10 light style flashlight. The interior of the item had residue inside it. Later when the suspect's son was interviewed he stated that his father had attached the item to the end of a firearm in the past. Additionally, the Montana Crime lab tested the item and determined that there were substances consistent with gunshot residue. Investigators were interested to know if the computers had been used to obtain information about silencers or other firearms related questions. Investigators noted that at least five rounds had been fired in the Homicide, yet no one in the home or neighborhood reported hearing any gun shots.
Investigators are asking for the search warrant to be granted to attempt to analyze the devices for data that may be related to the homicide, the planning of the homicide, and the investigation of crimes, including but not limited to, the homicide. Again, the computers were seized pursuant to a search warrant signed by Judge Todd on March 13, 2013. Due to the nature of this case and the development of additional information, your affiant is now seeking another search warrant out of an abundance of caution based on information contained herein.
Judge Todd signed the third warrant to search the three computers seized from Neiss's home for evidence connecting Neiss to Greene's death (August 2015 Warrant). Detective Bancroft executed the warrant, and his search revealed that, on one computer, a user had searched the internet for general information and videos about firearm suppressors and, more specifically, how to manufacture homemade suppressors.
¶11 After the August 2015 computer search, Neiss filed a second motion to suppress, this time contending officers lacked probable cause to search the computers and the delay between seizing and searching the computers-well over two years-was unreasonable. The District Court also denied the second motion.
¶12 In January 2016, the District Court held a seven-day jury trial. Throughout the trial, the State presented evidence about Neiss and Greene's history; Neiss's behavior the night of the murder; gunshot residue found on Neiss's hand and face the night of the murder; the shoeprints found on Greene's property; the .40 caliber shell casings found at the crime scene and on Neiss's property; a forensic examination indicating the casings at both locations came from the same weapon; and, because neighbors testified they heard no gunshots or unusual sounds the night of the murder, the computer search history and testimony from Neiss's son that Neiss had used and manufactured firearm suppressors. When settling jury instructions, ***11 the State sought to include an instruction regarding the interpretation of circumstantial evidence. Neiss objected to the instruction, but the District Court overruled his objection and gave the instruction to the jury. At the conclusion of trial, the jury convicted Neiss of deliberate homicide and evidence tampering. He appeals.
STANDARD OF REVIEW
¶13 We review a district court's denial of a motion to suppress to determine whether its findings of fact are clearly erroneous and whether its interpretation and application of the law is correct. State v. Kenfield , 2009 MT 242, ¶ 15, 351 Mont. 409, 213 P.3d 461.
¶14 We review a district court's legal conclusion about whether a search warrant is sufficiently particular de novo . State v. Seader , 1999 MT 290, ¶ 4, 297 Mont. 60, 990 P.2d 180.
*444 ¶15 A district court has broad discretion when giving jury instructions. We review the court's decision to give an instruction for abuse of discretion. State v. Sanchez , 2017 MT 192, ¶ 7, 388 Mont. 262, 399 P.3d 886. We review the instructions as a whole to determine whether they fully and fairly instruct the jury on the applicable law. Sanchez , ¶ 7. We will not reverse unless a mistake in instructing the jury prejudicially affected the defendant's substantial rights. State v. Kaarma , 2017 MT 24, ¶ 7, 386 Mont. 243, 390 P.3d 609.
DISCUSSION
¶16 1. Did the District Court properly deny Neiss's motion to suppress evidence seized pursuant to a search warrant that did not explicitly authorize a no-knock entry?
¶17 Neiss argues the State violated his rights under the Fourth Amendment of the United States Constitution and Article II, Sections 10 and 11, of the Montana Constitution, when the officers executed the first search warrant because they failed to abide by Montana's knock-and-announce rule. The knock-and-announce rule requires law enforcement officers, when executing a search warrant, to knock and announce their presence and wait a reasonable amount of time before entry. State v. Hill , 2008 MT 260, ¶ 27, 345 Mont. 95, 189 P.3d 1201 ; State v. Anyan , 2004 MT 395, ¶¶ 20, 64, 325 Mont. 245, 104 P.3d 511 ; see United States v. Banks , 540 U.S. 31, 38-40, 124 S. Ct. 521, 526-27, 157 L.Ed.2d 343 (2003). The State responds with the following three arguments: (1) the District Court did not err when it concluded the officers announced their presence and waited a reasonable amount of time before entering Neiss's house; (2) the officers did not need preauthorization from a judge for a no-knock entry; and (3) the proper remedy for a violation of ***12 the knock-and-announce rule is not exclusion of the evidenced obtained through the search. We address, first, our precedent from Anyan , ¶ 63, which requires officers to obtain preauthorization from a judge for no-knock entries based on circumstances known to the officers at the time of the application. Next, we address whether the March 2013 Warrant's execution was reasonable.
A. No-knock Entry Preauthorization.
¶18 In Anyan , ¶ 20, we discussed the knock-and-announce rule for the first time. Relying on the United States Supreme Court's decision in Wilson v. Ark. , 514 U.S. 927, 934, 115 S. Ct. 1914, 1918, 131 L.Ed.2d 976 (1995) [hereinafter Arkansas ], we adopted the rule, holding it is an element of the reasonableness inquiry under the Fourth Amendment and-independent of the federal requirement-Article II, Sections 10 and 11, of the Montana Constitution. Anyan , ¶ 61. We also adopted federal precedent creating an exigent-circumstances exception to the knock-and-announce rule. Anyan , ¶¶ 32-33 (citing Arkansas , 514 U.S. at 934, 936, 115 S. Ct. at 1918, 1919 ); see also Anyan ¶¶ 34-60 (reviewing various exigent circumstances that would justify a no-knock entry). However, in Anyan this Court added a requirement nonexistent in federal jurisprudence: "When law enforcement officers contemplate a no-knock entry in executing a search warrant, that intention must be included in the application for the search warrant along with any foreknown exigent circumstances justifying the no-knock entry." Anyan , ¶ 63 (emphasis added). Thus, we created the Anyan rule: officers applying for a warrant must receive preauthorization from a judge for no-knock entries based on exigent circumstances known to the officers at the time of the application. Anyan , ¶ 63 ; see State v. Ochadleus , 2005 MT 88, ¶ 55, 326 Mont. 441, 110 P.3d 448.
¶19 When reviewing the Anyan rule with the aid of federal precedent since our decision and alongside the circumstances of this case, it has become apparent that the rule creates an unworkable standard for investigative officers and judges alike. Here, particularly, the exigent circumstances justifying a no-knock entry were known to the officers when they applied for the warrant. That is, no additional facts or developments occurred after officers obtained the warrant which would support departure from the Anyan rule and allow the officers to enter without first knocking and announcing their presence.
*445 Recognizing a violation of the Anyan rule, the parties were forced to argue extensively whether the officers knocked and announced their presence and whether they waited a reasonable time before entering. Consequently, the District Court avoided addressing the Anyan rule that a warrant "must" include preauthorization for a no-knock entry based on ***13 "foreknown exigent circumstances" by finding that the officers did knock and announce prior to their entry into Neiss's residence. See Anyan , ¶ 63. Although, based on our rationale that follows, it is unnecessary to address the District Court's findings that officers actually knocked and announced, we observe it is undisputed officers did not knock on Neiss's door prior to entry and officers employed the flashbang device once they had already entered the sunporch of Neiss's residence. Moreover, the officers' entry into the main residence occurred within a second thereafter.
¶20 The Court will not, however, digress down the same path as the litigants and the District Court. It is clear the District Court's findings and the parties' argument concerning whether the officers actually knocked and announced prior to entry was premised upon their recognition that the Anyan rule had been violated-that exigent circumstances justifying a no-knock entry were foreknown to the officers when they applied for the warrant but the officers did not obtain no-knock preauthorization. Absent no-knock preauthorization, officers were required to knock and announce prior to entry into Neiss's residence. Thus, the violation of the Anyan rule mandated the inquiry on whether officers knocked and announced prior to entry, even though exigent circumstances existed for officers to execute a no-knock warrant. We therefore take this opportunity to reconsider the Anyan rule.
¶21 When we first created the Anyan rule, we believed it fit well within the warrant application process:
This approach is consistent with our prior jurisprudence-i.e., when the right to privacy must reasonably yield to an application to search, that decision should be made by a judicial officer, and not by the police. State ex rel. Townsend v. District Court , 168 Mont. 357, 360, 543 P.2d 193, 195 (1975). And, the review of a search warrant application by an impartial magistrate ensures that a neutral and detached evaluation of the situation is interposed between the investigating officer and the private citizen. State v. Wilson , 266 Mont. 146, 149, 879 P.2d 683, 684 (1994).
Anyan , ¶ 63.
¶22 Our reliance on Wilson and Townsend for this proposition, however, was misplaced. In Wilson , we held "Montana law requires that an impartial magistrate must determine the existence of ... probable cause ...." 266 Mont. at 149, 879 P.2d at 684 (internal quotations and citations omitted; emphasis added). In Townsend , we explained, "The requirement that the magistrate decide the existence of probable cause on the basis of facts sufficient to allow an ***14 independent determination, is imposed by Montana law to ensure that some neutral and detached evaluation is interposed between those who investigate crime and the ordinary citizen." 168 Mont. at 360, 543 P.2d at 195 (emphasis added). In both cases, we discussed how the judge's role is to assess the existence of probable cause. Importantly, however, whether probable cause exists to issue a warrant is fundamentally distinct from the issue of whether the manner of the warrant's execution is reasonable. A judge assesses the sufficiency of probable cause to authorize a warrant; law enforcement assesses the circumstances and means by which to execute the warrant in a manner that maximizes public safety, protects property, and secures evidence of a crime. Assessing the circumstances relative to executing a warrant is particularly within the expertise of law enforcement.
¶23 We find federal precedent helpful in understanding the deficiencies of Anyan . The Anyan rule confuses the protections of the warrant clause and reasonableness clause of Article II, Section 11 of the Montana Constitution. Foremost, the knock-and-announce rule is part of the reasonableness clause, not the warrant clause, of Article II, Section 11. Like the Fourth Amendment of the *446 United States Constitution, Article II, Section 11, has both a reasonableness clause and a warrant clause. The reasonableness clause protects against unreasonable searches and seizures, providing, "The people shall be secure in their persons, papers, homes and effects from unreasonable searches and seizures." Mont. Const. art. II, § 11. The warrant clause sets out warrant requirements, providing, "No warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing." Mont. Const. art. II, § 11. The warrant clause is a fundamental part of the reasonableness clause: barring limited exceptions, a warrantless search or seizure is categorically unreasonable. See State v. Ellis , 2009 MT 192, ¶ 24, 351 Mont. 95, 210 P.3d 144 ("[W]arrantless searches conducted inside a home are per se unreasonable, subject only to a few specifically established and well-delineated exceptions." (internal quotations omitted)). Accordingly, a valid warrant is only one consideration of a reasonable search: Article II, Section 11, protects citizens against "unreasonable searches and seizures"-even where officers otherwise possess a valid warrant. Mont. Const. art. II, § 11.
¶24 The knock-and-announce rule, like the warrant clause, is also a fundamental consideration of the reasonableness clause. However, compliance with the knock-and-announce rule is not one of the requirements of the warrant clause-the two are separate and distinct.
***15 Instead, the knock-and-announce rule evinces whether the ultimate search-the execution of the warrant-is reasonable. Regarding the federal constitution, the Supreme Court held in Banks , 540 U.S. at 35-36, 124 S. Ct. at 524-25 (2003) (quoting U.S. Const. amend. IV ) (internal citations omitted):
The Fourth Amendment says nothing specific about formalities in exercising a warrant's authorization, speaking to the manner of searching as well as to the legitimacy of searching at all simply in terms of the right to be "secure ... against unreasonable searches and seizures." Although the notion of reasonable execution must therefore be fleshed out, we have done that case by case, largely avoiding categories and protocols for searches.
¶25 The knock-and-announce rule and the warrant clause are separate and distinct components of a reasonable search or seizure. Importantly, Article II, Section 10, of the Montana Constitution specifically provides Montanans with a right to privacy: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." We have frequently recognized, " Article II, Sections 10 and 11 of the Montana Constitution provide greater protections against unreasonable searches and seizures and government infringement of individual privacy than does the federal constitution." Anyan , ¶ 61 (emphasis added). The knock-and-announce rule in Montana protects different interests than the warrant clause. In Anyan we explained that underlying the knock-and-announce rule are concerns for reducing the potential for violence and preventing the destruction of private citizens' property. Anyan , ¶¶ 23-25. We also described how the knock-and-announce rule protects interests unique to Montana-our right of privacy and enhanced protections against unreasonable searches and seizures found in Article II, Sections 10 and 11, of the Montana Constitution. Anyan , ¶¶ 20, 61. These interests, however, relate to the reasonableness of a warrant's execution and not to the judicial determination of probable cause.
¶26 Anyan failed to distinguish between the warrant clause and reasonableness clause of Article II, Section 11, and the comparable clauses contained in the Fourth Amendment. Importantly, Anyan improperly attached Montana's heightened right of privacy to the warrant clause of Article II, Section 11, which requires a probable cause determination to be made by an impartial judicial officer upon oath or affirmation. Obviously, the enhanced privacy protections contained in Article II, Section 10, which Anyan recognizes, do not preclude execution of a search warrant which is based upon probable ***16 cause, as here. By obtaining a warrant, *447 the state has demonstrated probable cause and a compelling interest in continuing to investigate a crime to which an individual's right to privacy protected by Article II, Section 10, must yield. Article II, Section 10 still, however, provides heightened protections against unreasonable searches, even where officers execute those searches pursuant to a warrant. Searches executed in an unreasonable manner may offend Article II, Section 11's reasonableness clause and the significant privacy interests enshrined in Article II, Section 10.
¶27 Consequently, the Anyan rule confuses the responsibilities of the judge with those of the officer. Although in Ochadleus , we recognized "an investigating officer may make a no-knock entry after a reasonable suspicion of exigency has ripened," Ochadleus , ¶ 56 (citing Banks , 540 U.S. 31, 124 S. Ct. 521 ), we never articulated the role the judge plays in evaluating the "reasonable suspicion of exigency" before the judge issues the search warrant. Nor did we address the situation where exigent circumstances clearly existed when officers applied for the warrant but the judge did not grant a no-knock preauthorization, as here. Surely Anyan should not be construed to require no-knock preauthorization by a judge, who presumably has no expertise in executing warrants, to take priority over the safety of officers and the public. The Anyan rule leaves unclear whether the judge must assess if the officer has a reasonable suspicion of exigency or if the judge has a reasonable suspicion of exigency. Additionally, questions arise where a warrant denies or is silent about a no-knock entry. For example, where officers gain a reasonable suspicion of a new exigency shortly after receiving a warrant but before arriving on-scene to execute it, the new exigency is not an unexpected exigent circumstance arising on-scene that would otherwise justify a no-knock entry under Anyan . See Anyan , ¶ 62. Therefore, it is unclear whether officers must reapply for no-knock authorization before executing the warrant.
¶28 We observe federal jurisprudence has distinguished between the warrant and reasonableness clauses of the Fourth Amendment and, upon such distinction, has not interpreted the Fourth Amendment as requiring officers to obtain advance authorization for a no-knock entry from a neutral and detached magistrate. In Dalia v. United States , 441 U.S. 238, 257 n.19, 99 S. Ct. 1682, 1693 n.19, 60 L.Ed.2d 177 (1979), the Supreme Court stated:
[C]ourts have upheld the use of forceful breaking and entering where necessary to effect a warranted search, even though the warrant gave no indication that force had been contemplated. To be sure, often it is impossible to anticipate when these actions will ***17 be necessary. Nothing in the decisions of this Court, however, indicates that officers requesting a warrant would be constitutionally required to set forth the anticipated means for execution even in those cases where they know beforehand that unannounced or forced entry likely will be necessary.
Years later, the Supreme Court considered an argument raised in Richards v. Wis. , 520 U.S. 385, 395-96, 117 S. Ct. 1416, 1422, 137 L.Ed.2d 615 (1997), that an entry was unreasonable where the magistrate signing the warrant explicitly deleted portions of the warrant giving officers permission to execute a no-knock entry. The Court held the magistrate's denial of a no-knock entry "does not alter the reasonableness of the officers' decision, which must be evaluated as of the time they entered the hotel room," and the actual circumstances "justified the officers' ultimate decision to enter without first announcing their presence and authority." Richards , 520 U.S. at 395-96, 117 S. Ct. at 1422.
¶29 More recently, federal circuit courts of appeals have made similar observations. See, e.g. , United States v. Ankeny , 502 F.3d 829, 835 (9th Cir. 2007) ("There is no requirement that the police obtain a no-knock warrant simply because one is available."); United States v. Boulanger , 444 F.3d 76, 83 (1st Cir. 2006) (rejecting an argument that police should have informed the judge issuing the warrant they intended to conduct a no-knock entry because "[t]he [Supreme] Court has ... made clear that the reasonableness of a police officer's decision to conduct a no-knock entry must be evaluated as of the time they conduct the entry." (citing *448 Richards , 520 U.S. at 395, 117 S. Ct. at 1422 ) (original quotations and brackets omitted)). Further, the First Circuit distinguished how the knock-and-announce rule "falls under the Fourth Amendment's reasonableness clause, as opposed to its warrant clause ." Boulanger , 444 F.3d at 83 (citing Arkansas , 514 U.S. at 930, 115 S. Ct. at 1916 ) (emphasis added).
¶30 In Hudson v. Michigan , 547 U.S. 586, 593-94, 126 S. Ct. 2159, 2165, 165 L.Ed.2d 56 (2006), the Supreme Court made a distinction similar to the First Circuit's. It concluded the interests protected by the warrant requirement are different than those protected by the knock-and-announce rule:
Until a valid warrant has issued, citizens are entitled to shield "their persons, houses, papers, and effects," from the government's scrutiny. Exclusion of the evidence obtained by a warrantless search vindicates that entitlement. The interests protected by the knock-and-announce requirement are quite different-and do not include the shielding of potential evidence from the government's ***18 eyes.
Hudson , 547 U.S. at 593, 126 S. Ct. at 2165 (quoting U.S. Const. amend. IV ). The Court clarified the interests protected by the knock-and-announce rule: the protection of "human life and limb" where an unannounced entry may provoke violence; the protection of property where, with proper notice, a property owner may avoid "the destruction of property occasioned by a forcible entry"; and the protection of privacy and dignity where the rule "assures the opportunity to collect oneself before answering the door." Hudson , 547 U.S. at 594, 126 S. Ct. at 2165 (internal quotations omitted). In this respect, the Court concluded: "What the knock-and-announce rule has never protected, however, is one's interest in preventing the government from seeing or taking evidence described in a warrant." Hudson , 547 U.S. at 594, 126 S. Ct. at 2165.
¶31 An impartial judge's primary responsibility when issuing a warrant is to determine whether probable cause exists to justify the search itself. Section 46-5-221, MCA ; Wilson , 266 Mont. at 149, 879 P.2d at 684. However, Montana law does not also require judges to determine whether the anticipated means of executing a warrant are reasonable. Moreover, there are no requirements set forth in the Montana Constitution nor the Montana Code Annotated that a judge determines prospectively whether exigent circumstances exist to justify a no-knock entry. See Mont. Const. art. II, §§ 10, 11 ; § 46-5-221, MCA (requiring only facts sufficient to support probable cause and a particular description of the place, object, or person to be searched and who or what is to be seized); see also §§ 46-5-101 to -228, MCA (describing legal authority and procedures for searches and seizures). Only the Anyan rule sets forth such a requirement.
¶32 We conclude Montanans' enhanced privacy protections do not compel judicial preauthorization of no-knock entries because the judge's role is to determine probable cause, not the manner of the warrant's execution. Montana's enhanced privacy protections may, however, compel an examination of the reasonableness of the warrant's execution. Importantly, a defendant may still challenge the reasonableness of a search and argue it violated his right to privacy protected by Article II, Sections 10 and 11, even though officers knocked and announced their presence . As we conclude the officers here had exigent circumstances to execute the March 2013 Warrant without knocking and announcing and the warrant's execution was reasonable, see infra ¶¶ 39-41, we do not address the remedy had the facts and circumstances supported a conclusion that the warrant's execution was unreasonable.
***19 ¶33 Lastly, we clarify that whether the March 2013 Warrant's execution was reasonable depends on whether the officers had a reasonable suspicion of exigent circumstances before effectuating the no-knock entry, and not whether exigent circumstances actually existed. Detective Bancroft listed several factors in the March 2013 Warrant application upon which he based his reasonable suspicion that exigent circumstances justified a no-knock entry. The judge, however, ultimately did not authorize a no-knock entry in the warrant. Based on the foregoing analysis, whether a no-knock entry was reasonable depends solely on whether the officers executing the warrant had a reasonable *449 suspicion of exigent circumstances justifying it.
¶34 An investigating officer may effectuate a no-knock entry if the officer has a reasonable suspicion of exigent circumstances. Ochadleus , ¶ 56 (citing Banks , 540 U.S. 31, 124 S. Ct. 521 ). Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." Anyan , ¶ 34 (quoting United States v. Zermeno , 66 F.3d 1058, 1063 (9th Cir. 1995) ). The burden of showing a reasonable suspicion "is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." Richards , 520 U.S. at 394, 117 S. Ct. at 1422.
¶35 Some of our prior cases differ on whether a reviewing court should review the officers' reasonable suspicion of exigent circumstances or the exigent circumstances themselves. In Anyan , we acknowledged that police must have a reasonable suspicion of exigent circumstances before justifying a no-knock entry, but we later rephrased the same rule as requiring courts to "determine whether an unannounced entry is reasonable under the particular circumstances of each case." Compare Anyan , ¶ 39 (citing Richards , 520 U.S. at 394-95, 117 S. Ct. at 1421-22 ), with Anyan , ¶ 64 (citing Richards , 520 U.S. at 394, 117 S. Ct. at 1421 ). In Cassady v. Yellowstone Cty. Mont. Sheriff Dep't , 2006 MT 217, ¶ 32, 333 Mont. 371, 143 P.3d 148, we evaluated "whether exigent circumstances obviated the knock and announce requirement under the present circumstances," but we made no reference to the officer's reasonable suspicion. In Ochadleus , we held investigating officers did not need to knock and announce their presence where doing so was futile, but we analyzed the actual futility of knocking and announcing under the circumstances-not whether the investigating officers had a reasonable suspicion of futility. Ochadleus , ¶¶ 47-48.
***20 ¶36 We clarify that review of the reasonableness of a warrant's execution is directed to whether the officers had a reasonable suspicion of exigent circumstances before effectuating the no-knock entry, and not whether exigent circumstances actually existed. See Hudson , 547 U.S. at 596, 126 S. Ct. at 2166 ("[A] mere 'reasonable suspicion' that knocking and announcing 'under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime,' will cause the requirement to yield." (quoting Richards , 520 U.S. at 394, 117 S. Ct. at 1421 )). Whether the exigent circumstances actually exist is immaterial-the officers only need a reasonable suspicion of them. Therefore, when reviewing a no-knock entry, courts must confine their review to the reasonableness of the officers' suspicion that exigent circumstances existed when they entered the protected area.
¶37 In conclusion, we have little difficulty holding that officers must have flexibility when evaluating the circumstances surrounding execution of a search warrant, including physical threats posed by knocking and announcing their presence along with any other exigent circumstance. By placing the onus on the judge issuing the warrant to prospectively evaluate exigent circumstances, the Anyan rule severely limits the officer's ability to protect the safety of other persons and property and to secure evidence. The Anyan rule creates confusion and, notwithstanding Anyan , lacks a sufficient foundation in Montana and federal law. We overrule Anyan to the extent it requires prior judicial approval for no-knock entries. Judges no longer have a role in determining whether officers may execute a warrant via a no-knock entry. Instead, officers serving a warrant may perform a no-knock entry if they have a reasonable suspicion of exigent circumstances. They may base their reasonable suspicion on information known both before and after the application for the search warrant. The manner of execution, including whether the officers abided by the knock-and-announce rule, is a factor a court should consider when assessing whether the search was constitutionally reasonable.
*450 ¶38 We now address whether exigent circumstances were present which justified a no-knock entry when officers executed the March 2013 Warrant.
B. The Reasonableness of the March 2013 Warrant's Execution.
¶39 In his original warrant application, Detective Bancroft asked the judge to approve a no-knock entry. The judge granted the search warrant, but-the parties debate whether inadvertently or by-design-the warrant itself did not contain a reference to a no-knock entry. Nevertheless, Lieutenant O'Donnell, the officer in charge of the ***21 SWAT team executing the warrant, testified he and his team were under the impression the warrant granted them the authority to execute a no-knock entry. After hearing testimony from multiple officers and viewing dashcam footage of the officers' entry into Neiss's home, the District Court concluded that, regardless of whether the warrant permitted a no-knock entry, the officers knocked and announced their presence and waited a reasonable amount of time before entering Neiss's home. On appeal, the parties argue extensively about whether the warrant was executed in a reasonable manner; specifically, whether officers knocked and announced their presence and whether they waited a reasonable time before entering. These factors and the District Court's findings and conclusions are relevant considerations when assessing the reasonableness of how the officers executed the warrant. Ultimately, however, the District Court's conclusion that there was no violation of the knock-and-announce rule is not dispositive of whether the search was reasonable. We therefore consider Neiss's argument that the warrant's execution was unreasonable.
¶40 The officers who executed Niess's search warrant gathered information from the crime scene, witnesses, prior police reports, and Neiss's criminal history to assess how they should approach serving a search warrant on Neiss. Neiss was a homicide suspect, and-unable to find the firearm used to kill Greene-the officers had reason to believe Neiss still possessed it. They knew that, some years before, Neiss was convicted of a federal firearms offense for illegal possession of a machine gun and multiple firearms. They reviewed police reports over the previous year which detailed one incident where Neiss threatened Greene with a baseball bat and another where multiple witnesses heard distant gunshots when Neiss drove away after threatening to kill Greene. The police reports indicated Neiss was often uncooperative with officers and believed them to be Greene's "accomplices." The officers also discovered that the sheriff's department used the SWAT team to serve warrants on Neiss in the past.
¶41 This information gave the investigating officers a suspicion that knocking and announcing under the particular circumstances would have posed a physical threat. Further, based on the quality of the information and the officers' knowledge at the time, their suspicion of exigent circumstances was reasonable. We conclude that the officers' execution of the March 2013 Warrant was reasonable and did not violate Neiss's right to privacy.
¶42 2. Did the District Court properly deny Neiss's motion to suppress evidence obtained through a forensic search of his computer?
***22 ¶43 Before searching Neiss's home, officers sought and received the March 2013 Warrant allowing for the seizure of any "[c]ell phones, IPads, computers and/or other electronic devices and the information contained therein." The warrant also allowed the officers to seize "[i]ndicia of Occupancy/Ownership in the form of documents, receipts, statements, mail, billing statements, letters, notes, [and] vehicle registration/titles." While executing the search warrant, the officers found and seized one desktop computer and two laptop computers from Neiss's home. Two years later, while still having custody over the electronic devices, police sought and obtained another warrant, the August 2015 Warrant, to search Neiss's computers. On September 9, 2015, Neiss filed a motion in limine in which he argued, in part, the March 2013 Warrant lacked probable cause and too much time had elapsed between seizure and issuance of the August 2015 Warrant. Neiss also argued the August 2015 Warrant lacked probable cause to search the *451 computers. Regarding the March 2013 Warrant, the District Court held: "Given the ubiquity of electronic communication and on-line social media communication, a reasonable homicide detective could believe that the ongoing dispute between Neiss and Greene could continue through email and social media." The District Court denied the challenge to the March 2013 Warrant. Regarding the August 2015 Warrant, the District Court found that because "investigators ultimately sought to examine the contents of the computers at a later date does not speak to the validity of the original warrant under which the computers were seized." The District Court concluded there were articulable facts which supported probable cause for issuance of the August 2015 Warrant.
¶44 On appeal, Neiss argues both warrants were "overbroad and lacked particularity." Neiss also argues the delay in issuing the August 2015 Warrant rendered the warrant invalid and any subsequent search unreasonable. We will address each of Neiss's contentions and untangle the arguments that have evolved in the context of computer searches and the issuance of two warrants related to the same property. However, as an initial and arguably dispositive matter, it is critical to note law enforcement did not search Neiss's computers pursuant to the March 2013 Warrant. Law enforcement lawfully seized the computers pursuant to the March 2013 Warrant but only searched them pursuant to the August 2015 Warrant when officers sought specific authorization from the District Court to search the computers' contents. While Neiss challenges the August 2015 Warrant based on overbreadth and lack of particularity, which we address infra , Neiss does not clearly argue a probable cause challenge to the August 2015 ***23 Warrant. However, because many of Neiss's arguments overlap and tangentially touch on probable cause, we will address the existence of probable cause for the August 2015 Warrant.
¶45 The situation here, where an electronic device is seized pursuant to lawful authority-the March 2013 Warrant-and probable cause subsequently scrutinized pursuant to a warrant for the contents of the computer-the August 2015 Warrant-is analogous to what we addressed in State v. Lacey , 2009 MT 62, 349 Mont. 371, 204 P.3d 1192. In Lacey , police received information from Lacey's girlfriend, Dozier, that she had observed pornographic images of her daughter on Lacey's computer. Lacey , ¶¶ 3-4. Police seized the computer based on Dozier's consent, which we later determined to be invalid. Lacey , ¶ 49. Nevertheless, we noted the police searched Lacey's computer only after receiving a valid federal search warrant. Lacey , ¶ 43. While concluding Dozier did not have the authority to consent to the seizure of Lacey's computer, we held "it is clear under the circumstances presented here that the evidence later discovered on the laptop pursuant to the federal search warrant is admissible under the 'inevitable discovery' exception to the fruit of the poisonous tree doctrine." Lacey , ¶ 52. Because the "officers did not search Lacey's laptop pursuant to Dozier's consent," "the question of whether Dozier could consent to a search of the laptop [was] immaterial to whether she could consent to its seizure." Lacey , ¶ 51.
¶46 In Lacey , it was immaterial whether the computer's initial seizure was lawful because the subsequent search pursuant to a warrant, which was inevitable, rendered the evidence admissible. Here, in contrast to Lacey , officers seized the computers pursuant to the lawful authority of the March 2013 Warrant and then subsequently obtained the August 2015 Warrant to search their contents. Therefore, regardless of whether the March 2013 Warrant would subsequently be determined invalid in a court proceeding, officers possessed Neiss's computers pursuant to the lawful authority of a warrant. Officers searched the computers pursuant to the August 2015 Warrant. We conclude, pursuant to Lacey , that suppression of the evidence is appropriate only if the August 2015 Warrant is constitutionally infirm.
¶47 Neiss challenged the March 2013 Warrant, and the District Court denied his motion to suppress. Thereafter, while still in lawful possession of the computers and without tampering with, altering, or searching their contents, officers secured the August 2015 Warrant, which was directed specifically *452 to the search of Neiss's computers. On appeal, Neiss raises the following challenges: (1) the August 2015 Warrant was invalid on its face because it erroneously referred to New ***24 Jersey as the location of the computers and never referenced any crime under investigation, (2) the second warrant lacked particularity and was overbroad, and (3) the delay between the seizure pursuant to the March 2013 Warrant and the ultimate search-which only occurred after the August 2015 Warrant-was unreasonable.
¶48 We have long held, "Appellants may not change their theories on appeal from those that they presented in district court." State v. Kuneff , 1998 MT 287, ¶ 26, 291 Mont. 474, 970 P.2d 556. Generally, "[f]ailure to make a timely objection during trial constitutes a waiver of the objection ...." Section 46-20-104(2), MCA. Neiss raises theories that the August 2015 Warrant was facially invalid and lacked particularity for the first time on appeal. Accordingly, we conclude he waived both arguments.
¶49 To persuade us otherwise, Neiss directs us to multiple motions he made to the district court where he objected to the computer evidence. After reviewing the record, however, we find that while Neiss clearly argued that the March 2013 Warrant lacked particularity, he made no such argument about the August 2015 Warrant; in the District Court, Neiss only claimed the August 2015 Warrant lacked probable cause, which he does not pursue on appeal.[2] Additionally, Neiss never raised the issue of facial validity with the District Court as to either warrant. "The reason for the contemporaneous objection rule ... is to allow the district court an opportunity, where possible, to remedy any error and we will not put a trial court in error where it has not been given such a chance to correct itself, absent an exception to the rule." State v. Clausell , 2001 MT 62, ¶ 25, 305 Mont. 1, 22 P.3d 1111. Neiss never gave the District Court an opportunity to evaluate the facial validity or particularity of the August 2015 Warrant-we will not fault the District Court here.
¶50 Neiss has, however, preserved his claim that the delay between the seizure and ultimate search of the computers was unreasonable.
***25 After first lawfully seizing the computers from Neiss's home, the State did not search them for well over two years. Between their seizure in March 2013 and Neiss's arrest in August 2014, however, Neiss never applied for their return.
¶51 Neiss's unreasonable delay argument rests primarily on United States v. Mitchell , 565 F.3d 1347, 1349 (11th Cir. 2009), where federal agents delayed obtaining a warrant for twenty-one days after an initial warrantless seizure of a hard drive. The Eleventh Circuit Court of Appeals held that while the initial warrantless seizure was permissible, the agents' subsequent delay in obtaining the warrant was unreasonable and infringed upon the defendant's possessory interests protected by the Fourth Amendment. Mitchell , 565 F.3d at 1350-52 ; see also Segura v. United States , 468 U.S. 796, 812, 104 S. Ct. 3380, 3389, 82 L.Ed.2d 599 (1984) ("[A] seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration" if police fail to obtain a search warrant within a reasonable period of time.).
¶52 The difference between Mitchell and the present case, however, is clear: while the agents in Mitchell unreasonably delayed obtaining a warrant after seizing Mitchell's computer, the officers here had already obtained a warrant before seizing Neiss's computers . Mitchell is therefore inapplicable. Furthermore, Neiss did not challenge the *453 March 2013 Warrant until May 2015. The District Court denied Neiss's motion to suppress and officers obtained the August 2015 Warrant specifically addressing a search of the computers. During this entire time, officers were lawfully in possession of the computers by the judicially-authorized March 2013 Warrant. The officers were not obligated to return the computers when they had judicial authorization to possess them.
¶53 We also note Neiss never applied for the computers' return. Therefore, we can hardly fault the State for retaining the computers in evidence pursuant to a valid warrant. Generally, after officers seize items through the authority of a warrant, § 46-5-312, MCA, provides a procedure for the owner of any property seized as evidence to apply for its return. Through that procedure, after the property owner petitions the court, the court holds a hearing to determine whether the property should be returned. Section 46-5-312, MCA. The state held Neiss's computers for over two years, but it did so pursuant to a valid warrant, and Neiss never asked for their return; hence, the length of seizure is irrelevant. In this case, the State's lengthy delay between its seizure and search of Neiss's computers did not render the search unreasonable.
***26 ¶54 Finally, although we find it difficult to discern a clear argument by Neiss that the August 2015 Warrant lacked probable cause, we will nonetheless address whether probable cause existed in the August 2015 warrant to search Neiss's computers.
¶55 Pursuant to the Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution, "[n]o warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing." Mont. Const. art. II, § 11 ; accord U.S. Const. amend. IV. Section 46-5-221, MCA, delineates basic requirements for a warrant in Montana:
A judge shall issue a search warrant to a person upon application ... made under oath or affirmation, that:
(1) states facts sufficient to support probable cause to believe that an offense has been committed;
(2) states facts sufficient to support probable cause to believe that evidence, contraband, or persons connected with the offense may be found;
(3) particularly describes the place, object, or persons to be searched; and
(4) particularly describes who or what is to be seized.
¶56 Essential to both constitutional provisions and § 46-5-221, MCA, is the particularity requirement. A search warrant must particularly describe which items are to be seized. The specificity required varies "depending on the circumstances of the case and the type of items involved." Seader , ¶ 13. "Generic categories or general descriptions of items are not necessarily invalid if a more precise description of the items to be seized is not possible." State v. Chilinski , 2014 MT 206, ¶ 22, 376 Mont. 122, 330 P.3d 1169 (quoting Seader , ¶ 13 ).
¶57 Nevertheless, "the scope of a lawful search is 'defined by the object of the search and the places in which there is probable cause to believe that it may be found.' " Maryland v. Garrison , 480 U.S. 79, 84, 107 S. Ct. 1013, 1016, 94 L.Ed.2d 72 (1987) (quoting United States v. Ross , 456 U.S. 798, 824, 102 S. Ct. 2157, 2172, 72 L.Ed.2d 572 (1982) ). A search warrant must limit the scope of a search to the specific areas and things for which there is probable cause to search. By so doing, "the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." Garrison , 480 U.S. at 84, 107 S. Ct. at 1016 ; see State v. Quigg , 155 Mont. 119, 132, 467 P.2d 692, 699 (1970)
***27 ("There must, of course, be a nexus ... between the item to be seized and criminal behavior." (quoting Warden, Md. Penitentiary v. Hayden , 387 U.S. 294, 307, 87 S. Ct. 1642, 1650, 18 L.Ed.2d 782 (1967) )); United States v. Towne , 997 F.2d 537, 544 (9th Cir. 1993) ("Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly *454 state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." (internal quotations and citations omitted)); see also 2 Wayne R. LaFave, Search and Seizure § 4.6(a), 767 (5th ed. 2012) ("[A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based."). The Supreme Court illustrated this concept further in Ross , 456 U.S. at 824, 102 S. Ct. at 2172 :
Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase.
¶58 With these principles in mind, we analyze their effect on the August 2015 Warrant and the subsequent search of the computers. We may easily think of a computer as a container-for example, a filing cabinet.[3] A computer, like a filing cabinet, is capable of storing vast amounts of documents, albeit in electronic form.[4] Furthermore, some ***28 of the limitations on searching each are similar: for example, while looking for a stolen car, police could not rummage through a filing cabinet; likewise, they could not look through a computer hard drive. See, e.g. , Ross , 456 U.S. at 824, 102 S. Ct. at 2172. However, when lawfully searching for documentary evidence-or other evidence of the kind that may be found in filing cabinets or computers-the scope of the police's search extends to either container if finding the evidence there is reasonably possible.[5] Cf. Ross , 456 U.S. at 821, 102 S. Ct. at 2171 ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); United States v. Snow , 919 F.2d 1458, 1461 (10th Cir. 1990) (holding a "locked safe was a likely source for the specified documents and could therefore be opened"); United States v. Hunter , 13 F. Supp. 2d 574, 581 (D. Vt. 1998) (holding a warrant authorizing a search for "records" permitted a search of "computers, disks, and similar property"). Likewise, officers may justify seizing both a computer and a filing cabinet for an off-site search where the items described in the warrant are so intermingled with undescribed items that sorting them on-site is impracticable. See United States v. Upham , 168 F.3d 532, 535-36 (1st Cir. 1999) (upholding a seizure and off-site search of computers because *455 "the mechanics of the search for images later performed off site could not readily have been done on the spot."); United States v. Hargus , 128 F.3d 1358, 1363 (10th Cir. 1997) (concluding the seizure of filing cabinets was reasonable where sorting the records on-site was impracticable).
¶59 The August 2015 Warrant recited the lengthy and on-going history of Neiss's dispute with Greene. In particular, when officers searched Neiss's residence in March 2013, they observed computer ***29 printouts which indicated someone had been actively using a computer. The officers noted a letter Neiss wrote to himself detailing his history with Greene, and the officers averred they suspected Neiss might keep a journal or log of events on one or more of the computers. Importantly, officers had located the body of a Maglite flashlight during the August 2014 search of Neiss's residence which appeared to have been modified to be a firearm silencer. As the Montana Crime Lab would later confirm, the interior of the silencer had gunshot residue on it. The application also detailed how Neiss's son stated that his father had attached the homemade silencer to the end of a firearm in the past. The application also explained at least five rounds had been fired in the homicide and no one in the home or neighborhood had heard gunshots. The affiant requested a search warrant for Neiss's computers to learn if Neiss had sought information about silencers or firearms over the internet or whether the computers otherwise contained such information.
¶60 We have little difficulty concluding there were sufficient facts, under the totality of the circumstances, there was a fair probability Neiss's computers could contain information about silencers or firearms-related inquiries or journals or logs of Neiss's history with Greene. The District Court did not err in denying Neiss's motion to suppress the August 2015 Warrant.
¶61 3. Did the District Court abuse its discretion by instructing the jury to choose the "most reasonable" interpretation of circumstantial evidence if there were two competing interpretations-one that supported innocence and one that supported guilt?
¶62 The District Court gave the following jury instruction: "When circumstantial evidence is susceptible to two interpretations, one that supports guilt and the other that supports innocence, the jury determines which is most reasonable." On appeal, Neiss argues the District Court abused its discretion by giving the instruction, reasoning the instruction diluted the State's burden of proof and compromised his right to be presumed innocent. The State argues the jury instructions, as a whole, fully and fairly instructed the jury on the State's burden of proof and the concept of reasonable doubt . It points us to our recent decisions in Sanchez and State v. Iverson , 2018 MT 27, 390 Mont. 260, 411 P.3d 1284, where we considered the same circumstantial-evidence instruction.
¶63 In Sanchez , we concluded that, on its face, the disputed circumstantial-evidence instruction did not relieve the State of any of its burden to prove guilt beyond a reasonable doubt. We observed:
Rather, it only provided the jury with some guidance for resolving ***30 competing interpretations of circumstantial evidence. If the jury found that an interpretation of circumstantial evidence was reasonable, it could be considered in conjunction with any other evidence to determine whether the State met its burden to prove guilt of each offense beyond a reasonable doubt. It is the overall weight of the evidence, and not any particular inference from the evidence, that determines the jury's ultimate decision on guilt. The existence of alternative interpretations of circumstantial evidence does not mean that both interpretations are equally persuasive or weighty.
Sanchez , ¶ 16. We also cited numerous cases where we held that determining the weight and credibility of conflicting evidence and drawing inferences from circumstantial evidence are exclusively the province of the jury. Sanchez , ¶ 19.
¶64 In Iverson , we once again considered the instruction and concluded the district court fully and fairly instructed the jury regarding the State's burden of proof. Iverson , ¶ 19. We evaluated the jury instructions defining the State's burden of proof and reasonable doubt , and we looked to precedent *456 plainly holding the circumstantial-evidence instruction was acceptable. Iverson , ¶ 19 (citing Sanchez , ¶¶ 16-17 ).
¶65 The District Court here clearly instructed the jury on the State's burden of proof:
The State of Montana has the burden of proving the guilt of the Defendant beyond a reasonable doubt. Proof beyond a reasonable doubt is proof of such a convincing character that a reasonable person would rely and act upon it in the most important of his or her own affairs. Beyond a reasonable doubt does not mean beyond any doubt or beyond a shadow of a doubt.
¶66 The District Court also instructed the jury on the presumption of innocence:
The Defendant is presumed to be innocent of the charge against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict. It is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that the defendant is guilty. The Defendant is not required to prove his innocence or present any evidence.
¶67 Neiss's arguments against the circumstantial-evidence jury instruction are nearly identical to the arguments the defendants in Sanchez and Iverson made. Consequently, just as the Court held in Sanchez and Iverson , we hold Neiss's jury instructions, as a whole, "fully and fairly instruct[ed] the jury on the applicable law." See ***31 Iverson , ¶ 10 ; Sanchez , ¶ 7. Our recent decisions from Sanchez and Iverson are controlling.
¶68 Finally, as the Court considered in Sanchez , we address the nature and strength of the state's evidence that was presented for the jury to consider. Here, the State presented evidence of Neiss and Greene's history, Neiss's behavior the night of the murder, gunshot residue found on Neiss's hand and face the night of the murder, shoeprints found on Greene's property leading to and from the direction of Neiss's property, a forensic examination indicating casings around Greene's body and those in Neiss's home came from the same weapon, and testimony from Neiss's son that Neiss had used and manufactured homemade firearm suppressors. Based on our controlling precedent, and in light of this evidence, the District Court did not err in giving the disputed instruction.
CONCLUSION
¶69 The knock-and-announce rule remains a fundamental component of the reasonableness clause of Article II, Section 11, and the right of privacy under Article II, Section 10, of the Montana Constitution. Nevertheless, we overturn the Anyan rule insofar as it requires investigating officers to obtain authorization from a judge to execute a no-knock entry. We also clarify that officers may execute a no-knock entry where they have a reasonable suspicion of exigent circumstances justifying it. Based on the averments presented in the application for the March 2013 Warrant, investigating officers had a reasonable suspicion of exigent circumstances justifying a no-knock entry into Neiss's residence. We conclude they did not violate Neiss's constitutional protections under Article II, Sections 10 and 11, of the Montana Constitution.
¶70 We hold officers may seize an electronic device pursuant to a warrant where the type of evidence the officers are looking for could reasonably be found on the device. Where officers are lawfully in possession of property, do not search the property, and subsequently secure a search warrant for the property, suppression of the evidence is appropriate only if the warrant pursuant to which the search was conducted is constitutionally infirm.
¶71 We also hold the jury instructions, taken as a whole, fully and fairly instructed the jury on the proper burden of proof. The District Court did not abuse its discretion by giving the circumstantial-evidence instruction Neiss takes issue with on appeal.
¶72 We affirm.
We concur:
MIKE McGRATH, C.J.
JAMES JEREMIAH SHEA, J.
BETH BAKER, J.
JIM RICE, J.
Justice Ingrid Gustafson, concurring and dissenting.
*457 ***32 ¶73 Although I concur in the Majority's holding that the search pursuant to the March 2013 search warrant was lawfully executed, I disagree with its decision to overturn the District Court's findings and conclusions. I would uphold the District Court's finding that law enforcement announced its presence and its conclusion that officers waited a reasonable amount of time before entering Neiss's home.
¶74 I further disagree with the Majority's holding on Issue Two and dissent on that issue. I would conclude the computers were improperly seized under the 2013 search warrant and unlawfully searched under the 2015 search warrant, and that the admission of the computer evidence was reversible error.
Issue One
A. Substantial evidence supports the District Court's finding that officers announced their presence before entering Neiss's home.
¶75 On March 13, 2013, Detective Shane Bancroft of the Yellowstone County Sheriff's Office applied for a search warrant for Neiss's residence. He requested "an exception to the 'Knock and Announce' requirement" due to "Neiss's criminal history and the information regarding his recent involvement with firearms." However, the search warrant the District Court issued was silent about the manner of execution.
¶76 A year and five months later, on August 11, 2014, the State moved for leave to file an information and the District Court issued an arrest warrant for Neiss. On May 15, 2015, Neiss moved to suppress the fruits of the search law enforcement had conducted pursuant to the March 2013 search warrant. He argued the manner of execution was improper because the officers allegedly executed a no-knock entry when the warrant did not authorize such. The District Court denied Neiss's motion because it disagreed that the officers executed a no-knock entry.
¶77 On appeal, Neiss argues the District Court erred in concluding law enforcement executed a knock-and-announce entry. Specifically, he claims officers waited an insufficient amount of time after they announced their presence until they entered his residence for the execution to be considered knock-and-announce. Thus, the issue before the Court is the issue Neiss presents on appeal: Did the District Court err when it determined law enforcement conducted a knock-and-announce execution of the March 2013 search warrant at Neiss's residence?
***33 ¶78 Section 46-20-104, MCA, sets forth the scope of appeal available to criminal defendants. It provides:
(1) An appeal may be taken by the defendant only from a final judgment of conviction and orders after judgment which affect the substantial rights of the defendant.
(2) Upon appeal from a judgment, the court may review the verdict or decision and any alleged error objected to which involves the merits or necessarily affects the judgment....
¶79 Section 46-20-103, MCA, sets forth the scope of appeal provided to the State. It provides, in part that, except as otherwise specifically authorized, the State may not appeal in a criminal case. Section 46-20-103(1), MCA. While § 46-20-103(2), MCA, enumerates exceptions to this rule, including "suppressing evidence" in § 46-20-103(2)(e), MCA, it provides no exception for cases such as this, in which the State received a favorable evidentiary ruling at the trial court level.
¶80 Thus, the State has no right of appeal in this case and this Court may only review alleged errors objected to by Neiss, the defendant. The State, however, indicated in its response brief that it preferred this Court consider a different issue on appeal than the issue Neiss presented. Disregarding the District Court's conclusion that officers knocked and announced, it argues, "This Court should abandon Anyan's warrant requirement and instead simply consider whether, at the time *458 of entry, the officers were in possession of sufficient objective facts from which a reasonable officer would suspect that announcing their presence prior to entry would present a risk of physical harm, as the federal courts have done." The State further offers that "[a]lternatively," this Court could uphold the District Court's determination that law enforcement knocked and announced.
¶81 Generally, appellees urge us to uphold the ruling of the lower court rather than argue affirmation of the lower court as a last resort. That is the difference between being an appellee and being a cross-appellant. Although the Majority deems this case an "opportunity to reconsider the Anyan rule," Opinion, ¶ 20, that opportunity does not arise unless and until this Court concludes the District Court erred in determining that officers conducted a knock-and-announce entry. Thus, I would consider the correctness of the District Court's rulings prior to embarking on a mission to overturn established precedent. Rather than deciding the issue squarely presented by Neiss, this Court views the State's brief as a cross-appeal and has neither upheld the decision of the District Court nor ruled upon the issue raised by the defendant on appeal. The Majority's decision to take up the State's cause while sidelining the issue appealed by the defendant is improper.
***34 ¶82 This Court reviews a district court's ruling on a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and whether the court's interpretation and application of the law are correct. Muir v. Bilderback , 2015 MT 180, ¶ 9, 379 Mont. 459, 353 P.3d 473 (citation omitted). A trial court's findings are clearly erroneous if not supported by substantial evidence, if the court has misapprehended the effect of the evidence, or if this Court's review of the record leaves us with the firm conviction that a mistake has been made. State v. Grmoljez , 2019 MT 82, ¶ 6, 395 Mont. 279, 438 P.3d 802 (citation omitted). "Substantial evidence" is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. State v. Milhoan , 224 Mont. 505, 509, 730 P.2d 1170, 1172 (1986) (citation omitted).
¶83 On appeal, Neiss argues the District Court erred in finding the officers executed a knock-and-announce warrant because they did not wait a "reasonable period of time" to enter after they announced. The Majority found it "unnecessary to address" whether this finding was clearly erroneous. Opinion, ¶ 19. Although the Majority notes that officers did not knock prior to entry, it does not determine whether the failure to knock in and of itself negates a knock-and-announce execution, and it avoids determining whether, as the officers testified and the District Court found, the officers announced their presence prior to entering.
¶84 Since the District Court ruled that Neiss failed to meet his burden of proving the search was illegal, the question this Court should have addressed is whether substantial evidence supports the District Court's determination that law enforcement executed a knock-and-announce entry. I believe the record provides sufficient evidence to support the District Court's determination. At the suppression hearing, Lieutenant Kent O'Donnell, the SWAT team leader, testified, "Just prior to entry into the residence, lights were activated on ... all of the patrol vehicles, on the [ballistic rescue vehicle] as well; and then myself, Lieutenant Bofto and Captain Michaelis were all on the public address system of the vehicle announcing Sheriff's Office, search warrant, Sheriff's Office, search warrant." After the announcement, a team member deployed a flash-bang concussion device as a signal for the team to enter the residence. The State asked O'Donnell if law enforcement announced its presence prior to entering the residence and he replied, "Absolutely." He later explained, "I believe the warrant ... our detectives obtained was a no knock. On this particular situation we decided to do lights and announce prior to entry, which would be similar with a knock and announce warrant." He further explained ***35 that in this instance, law enforcement presence would have included the SWAT team to execute this warrant, regardless of whether the execution was no-knock or knock-and-announce. He explained that in this instance, law enforcement decided to announce for several reasons, including the possible presence of children in the residence, the knowledge *459 that there were dogs in the residence, and the occupants' history of firearms possession. He said, "[W]e decided that we would do a-basically an announce with the lights and the PA at the very last second prior to entry, so it wouldn't ... be confused that we were burglars or robbers...." In other words, in spite of the fact that law enforcement sought a no-knock warrant on the theory that Neiss was dangerous, law enforcement ultimately determined that it would actually be safer to announce its presence.
¶85 The State also entered into evidence video recordings from some of the law enforcement vehicles at the scene. At the hearing, it played the first few minutes of videos from two vehicles which showed the SWAT team's actions up to the moment of entry-including their announcement. In its Order Denying Defendant's Motion to Suppress, the District Court found, "[I]t is clear to this Court that officers announced their presence immediately before entering the premises." Noting that the officers used "several tactics," including flashing lights and two officers announcing their presence over a loudspeaker, the court concluded Neiss's Fourth Amendment rights were not violated "because the Sheriff's Department clearly announced their presence ... before entering the home."
¶86 The weight of the evidence and the credibility of the witnesses are exclusively the province of the trier of fact and, in the event of conflicting evidence, it is within the province of the trier of fact to determine which will prevail. State v. Flack , 260 Mont. 181, 189, 860 P.2d 89, 94 (1993) (citation omitted). Here, the District Court heard live eyewitness testimony and viewed videos of the warrant execution. Under our standard of review, the question before this Court is not whether it would have ruled differently, but whether the District Court's ruling should be upheld. State v. Roper , 2001 MT 96, ¶ 11, 305 Mont. 212, 26 P.3d 741 (citation omitted). A review of the record convinces me that sufficient evidence supports the District Court's finding. I would conclude the District Court did not err in finding that law enforcement announced prior to entering Neiss's home.
B. The District Court's conclusion that Neiss's constitutional rights were not violated is not clearly erroneous.
¶87 In addition to upholding the finding that the officers announced their presence prior to entering Neiss's home, I would also uphold the ***36 District Court's conclusion that the search warrant was adequately executed as a knock-and-announce warrant such that Neiss's constitutional rights were not violated.
¶88 In its Opinion, the Majority alludes to the parties' dispute over whether the officers knocked and announced, and whether they then waited a "reasonable time" before entering. Opinion, ¶ 19. However, it characterizes the primary dispute as a mere digression and declines to address it. Opinion, ¶ 20. Instead, it takes the "opportunity" to overrule Anyan -an opportunity which does not exist unless the Court first concludes the District Court erred.
¶89 In Anyan , this Court noted that knock-and-announce is a flexible rule, and the time an officer must wait before using force to enter depends on the facts and circumstances of each case. Anyan , ¶ 64 (citations omitted). Neiss argues that what we call "knock and announce" is really "knock, announce, and wait , for at least a reasonable period of time" before entering. (Emphasis in original.) He relies on Banks , in which the U.S. Supreme Court considered how to determine how long law enforcement must reasonably wait to enter after knocking and announcing. Banks , 540 U.S. at 35, 124 S. Ct. at 524. The Supreme Court declined to set forth criteria for reasonableness, but affirmed its practice of considering reasonableness on a case-by-case basis. Banks , 540 U.S. at 35-36, 124 S. Ct. at 525. In Banks's case, which was a drug case, the Supreme Court concluded law enforcement had reasonably waited 15 to 20 seconds before entering forcibly because if officers had waited longer, Banks would have had ample opportunity to dispose of the evidence. Banks , 540 U.S. at 38, 124 S. Ct. at 526. The Supreme Court found the act of knocking and announcing created the exigent need to enter, and the "crucial fact" in determining a reasonable *460 time to wait was the imminent disposal of the evidence. Banks , 540 U.S. at 40, 124 S. Ct. at 527.
¶90 Here, the State maintains officers waited 12 to 13 seconds before entering "the living space of the home." Law enforcement's primary concern was not destruction of evidence, but the possibility Neiss posed a danger due to a history of illegal firearms possession and a distrust of police. Thus, the question of a reasonable length of time is determined by how long it could take for Neiss to arm himself after the police announced their presence. Here, based on the evidence before it, the District Court determined it could take Neiss mere seconds to do so. From the facts articulated in the search warrant application, it is not unreasonable for officers to fear that Neiss slept with a loaded firearm nearby and was prepared to use it as he saw necessary. Although on these facts, I may have concluded the officers should have ***37 waited a longer period of time before entering forcibly, I cannot conclude the District Court erred in its application of facts to law.
¶91 Because I would uphold the District Court, I would end my analysis of this issue here. However, in addition to disagreeing with the Majority's decision to reach an Anyan analysis, I disagree with the grounds upon which the Majority has overruled Anyan , as set forth below.
¶92 First, the Majority declares Anyan must be overruled because it is "unworkable"-although Anyan worked in this case, according to the District Court-and the State offers no evidence of Anyan's alleged lack of workability. The Majority takes issue with the fact that, had the District Court found that law enforcement executed a no-knock warrant, and had the court not found grounds to excuse the error since officers believed they had obtained a no-knock warrant, the March 2013 search would have been suppressed. The Majority explains, "[N]o additional facts or developments occurred after officers obtained the warrant which would support departure from the Anyan rule and allow the officers to enter without first knocking and announcing their presence." Opinion, ¶ 19 (emphasis in original). However, assuming arguendo that the District Court erred in finding the officers knocked and announced, all that would have needed to occur would have been for Detective Bancroft to read the warrant the court signed. It is true that "the parties were forced to argue extensively whether the officers knocked and announced their presence and whether they waited a reasonable time before entering," Opinion, ¶ 19, but this did not occur because Anyan presented an insurmountable hurdle. Rather, it occurred because the officers' knock-and-announce execution was haphazard, thus giving Neiss a colorable challenge to its lawfulness. Expecting officers to have some familiarity with the requirements of the warrant they are executing is not unworkable, nor is it unworkable to expect officers to definitively knock and announce when obligated to do so. Where fundamental constitutional rights are at issue, neither this Court, nor any court, should find it unreasonable to expect officers executing a search warrant to have read the warrant beforehand and acted in accordance with its requirements.
¶93 Next, the Majority argues Anyan was wrongly decided because it places the responsibility for determining the reasonableness of a search on a judge instead of on law enforcement. The Majority maintains the judge's role is only to determine the existence of probable cause. The Majority alleges Anyan incorrectly held that a judge, and not the police, should determine if a person's right to privacy must yield to a search because the yielding of the right to privacy is as to whether ***38 officers should be permitted to search at all, and not to how they may execute a search for which probable cause has been established. However, even without an explicit right to privacy in the U.S. Constitution, the U.S. Supreme Court has rejected this reasoning in applying the Fourth Amendment to the execution of no-knock entries pursuant to a valid search warrant. In Richards v. Wisconsin , 520 U.S. 385, 387-88, 117 S. Ct. 1416, 1418, 137 L.Ed.2d 615 (1997), the U.S. Supreme Court considered a challenge to a decision in which the Wisconsin Supreme Court concluded that police officers are not required to knock and announce when executing a search warrant in a felony *461 drug investigation. In that case, the Wisconsin Supreme Court had held that only a minimal violation of privacy occurs when officers, pursuant to a warrant, forcibly enter a residence without announcing their presence because the residents would have been without authority to deny entry in any event. Like the Majority in this case, the Wisconsin court had concluded that the principal intrusion on privacy occurred with the issuance of the warrant, not the manner of execution. Richards , 520 U.S. at 390, 117 S. Ct. at 1419-20. The U.S. Supreme Court disagreed:
The State asserts that the intrusion on individual interests effectuated by a no-knock entry is minimal because the execution of the warrant itself constitutes the primary intrusion on individual privacy .... While it is true that a no-knock entry is less intrusive than, for example, a warrantless search, the individual interests implicated by an unannounced, forcible entry should not be unduly minimized. As we observed in [ Wilson , 514 U.S. at 930-32, 115 S. Ct. at 1916-17 ], the common law recognized that individuals should have an opportunity to themselves comply with the law and to avoid the destruction of property occasioned by a forcible entry. These interests are not inconsequential.
Additionally, when police enter a residence without announcing their presence, the residents are not given any opportunity to prepare themselves for such an entry. The State pointed out at oral argument that, in Wisconsin, most search warrants are executed during the late night and early morning hours. Tr. of Oral Arg. 24. The brief interlude between announcement and entry with a warrant may be the opportunity that an individual has to pull on clothes or get out of bed.
Richards , 520 U.S. at 393, 117 S. Ct. at 1421, n. 5.
¶94 The U.S. Supreme Court rejected a blanket exception to the knock-and-announce rule, stating:
[T]he fact that felony drug investigations may frequently present ***39 circumstances warranting a no-knock entry cannot remove from the neutral scrutiny of a reviewing court the reasonableness of the police decision not to knock and announce in a particular case. Instead, in each case, it is the duty of a court confronted with the question to determine whether the facts and circumstances of the particular entry justified dispensing with the knock-and-announce requirement.
Richards , 520 U.S. at 394, 117 S. Ct. at 1421. The U.S. Supreme Court observed that the rule justifying a no-knock entry must strike a balance between legitimate law enforcement concerns and "the individual privacy interests affected by no-knock entries." Richards , 520 U.S. at 394, 117 S. Ct. at 1421-22. Later, relying on Richards , it again confirmed that "the knock-and-announce rule protects those elements of privacy and dignity that can be destroyed by a sudden entrance." Hudson v. Michigan , 547 U.S. 586, 594, 126 S. Ct. 2159, 2165, 165 L.Ed.2d 56 (2006).
¶95 The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in the light of the particular circumstances. Terry v. Ohio , 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). Here, the Majority limits the effectiveness of judicial scrutiny, increasing the risk that citizens' constitutional rights will be violated by unreasonable searches rather than seeking to prevent such violations from occurring.
¶96 This begs the question as to why, up to now, we have required law enforcement to seek permission rather than ask for forgiveness when the exigent circumstances justifying a no-knock entry are foreknown? The answer lies in Article II, Section 10, of the Montana Constitution, which affords Montanans greater privacy protections than does the U.S. Constitution. Gryczan v. State , 283 Mont. 433, 448, 942 P.2d 112, 121 (1997) (citation omitted). An unconstitutional invasion of the right to privacy cannot be undone once it has occurred; under Anyan , when the exigent circumstances are foreknown to law enforcement, they present that evidence to the judge issuing the search warrant so that the judge-before privacy is invaded-can *462 determine the reasonableness of the execution. Anyan's preauthorization requirement benefits both suspect and law enforcement: Under this rule, not only are Montanans' rights protected, but officers need not predict whether a judge will ratify their decision to execute a no-knock entry after the fact. ***40 ¶97 The Anyan rule in no way prevents officers from executing a no-knock entry should exigent circumstances arise later. It explicitly holds "that the decision to make a no-knock entry should ordinarily be made by a neutral and detached magistrate. ... An investigating officer, may, however, make this decision based on unexpected exigent circumstances that arise on the scene." Anyan , ¶ 62. Although the Majority asserts that Anyan fails to explain what officers should do if exigent circumstances arise after the warrant is issued but before officers arrive on-scene to serve it, and whether it is the judge or the officer who must have a reasonable suspicion of exigency to issue a no-knock warrant, these scenarios were not before the Court in Anyan nor are they present here. Nor does the potential for a novel scenario to arise in a future case render a fatal blow to Anyan's reasoning. The fact that Anyan does not speculate on these scenarios does not preclude this Court from ruling upon them when such come before it.
¶98 Rather than recognizing the role Article II, Section 10, plays in evaluating no-knock entries, and the importance this Court placed upon Montana's right to privacy in determining that Montanans are entitled to a heightened expectation of privacy under our Constitution, the Majority has in this case upended our search and seizure jurisprudence and its application of the Montana Constitution and relied solely on federal case law. The Majority asserts that Anyan "added a requirement nonexistent in federal jurisprudence," Opinion, ¶ 18, without giving proper due to the basis for Anyan's departure from federal jurisprudence: "The right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." Mont. Const. art. II, § 10. The Majority grounds its decision on a comparison of two clauses of Article II, Section 11, of the Montana Constitution, but it neglects Article II, Section 10, and the paramount significance of our constitutional right to privacy in Anyan's holding. Anyan , ¶ 61, explicitly holds, " Article II, Sections 10 and 11 of the Montana Constitution provide greater protections against unreasonable searches and seizures and government infringement of individual privacy than does the federal constitution." Here, the Majority faults Anyan and finds the federal precedent persuasive even though federal jurisprudence provides no precedents for the interpretation of our State Constitution.
¶99 Until now, this Court has addressed Article II, Section 10, in conjunction with Article II, Section 11, in analyzing and resolving search or seizure issues that specifically implicate the right to privacy. State v. Goetz , 2008 MT 296, ¶ 14, 345 Mont. 421, 191 P.3d 489 (citations omitted). Article II, Section 10, does not have a federal ***41 constitutional counterpart. Montana's unique constitutional language affords citizens a greater right to privacy, and therefore, broader protection than the Fourth Amendment in cases involving searches of, or seizures from, private property. State v. Hardaway , 2001 MT 252, ¶ 31, 307 Mont. 139, 36 P.3d 900 (citation omitted).
¶100 In Hardaway , we summarized some of the history of this Court's jurisprudence regarding the application of Article II, Section 10, to search and seizure issues:
Prior to 1972, Article II, Section 10 did not exist and there was no explicit right of privacy in the Montana Constitution.... For several years after the adoption of the 1972 Montana Constitution, cases raising search and seizure issues under Article II, Section 11 generally followed the lead of the U.S. Supreme Court. Similarly, as the 1972 right to privacy developed, our privacy decisions also tended to follow U.S. Supreme Court decisions....
[F]rom the mid-1980s through the early 1990s, the Court provided no greater protection for individual privacy in search and seizure cases than parallel federal law provided. However, since City of Billings v. Whalen (1990), 242 Mont. 293, 790 P.2d 471, this Court has given increased protection *463 to the privacy rights of Montana citizens, limiting the scope of search and seizure cases, and since State v. Bullock [, 272 Mont. 361, 901 P.2d 61 (1995) ], the Court has applied Article II, Section 10, emphasizing privacy as a mechanism to support interpretation of search and seizure cases. In the ensuing years, we consistently analyzed search and seizure cases involving significant privacy issues under both Sections 10 and 11 of Article II of the Montana Constitution.
Hardaway , ¶¶ 50-51 (internal citations and quotations omitted).
¶101 In Goetz , we recognized this Court had made inconsistent rulings regarding the constitutionality of warrantless audio recording where one party had agreed to be recorded but another party was unaware of the recording. Goetz , ¶¶ 11-12 (citing State v. Solis , 214 Mont. 310, 693 P.2d 518 (1984) (holding that videos of defendant's transactions in a pawn shop where defendant was unaware of being filmed were properly suppressed); State v. Brown , 232 Mont. 1, 755 P.2d 1364 (1988) (holding that audio recordings between defendant and an undercover police officer were properly admitted)). We scrutinized the legal analysis of Solis and Brown and concluded that our analysis in Brown fell short because, "notwithstanding our recognition in Brown that Article II, Sections 10 and 11 of the Montana Constitution, taken together, grant rights beyond those contained in the federal ***42 constitution, our resolution of that case merely paralleled federal jurisprudence on the subject and failed to properly analyze the greater rights guaranteed by Montana's Constitution." Goetz , ¶ 22. We overruled Brown because we determined it "provides little, if any, guidance in resolving the issue before us in light of the reliance on federal jurisprudence-and limited analysis and application of the provisions of the Montana Constitution." Goetz , ¶ 24.
¶102 Here, the Majority repeats Brown's errors. It bases its rationale for overruling Anyan on federal jurisprudence while at the same time placing greater responsibility for determining reasonableness of a no-knock entry in the hands of law enforcement than federal case law supports. Therefore, I not only take issue with the Majority's decision to reach reconsideration of Anyan in the present case, but I believe the Majority's bases for choosing to overrule Anyan are unfounded.
Issue Two
¶103 As to Issue Two, I agree with Neiss that the District Court erred in denying his motion to suppress the search of the computers. Neiss makes four arguments regarding this search. First, he argues the 2013 search warrant lacked particularity, was overbroad, and offered no probable cause to justify the seizure of the computers. Next, he argues the 2015 search warrant did not validly authorize the search of the computers because it was invalid on its face and lacked particularity. Third, he argues the two-year delay in searching the computers after their seizure is unreasonable. Finally, he argues the State cannot prove the errors made regarding the denial of his motion to suppress were harmless.
¶104 Section 46-5-221(2), MCA, requires a search warrant application to state facts sufficient to support probable cause to believe evidence connected with the offense may be found. This Court assesses the totality of the circumstances to determine whether a search warrant is based upon probable cause. The official issuing the warrant must make a practical, commonsense determination, given all the evidence contained in the search warrant application, whether a fair probability exists that contraband or evidence of a crime will be found in a particular place. Probable cause must be determined from within the four corners of the application for a warrant, and the official's determination that probable cause exists is entitled to great deference, with every reasonable inference possible drawn to support the determination of probable cause. Muir , ¶ 12 (citations and internal quotations omitted).
A. The 2013 search warrant application provided insufficient ***43 probable cause to justify seizing the computers.
¶105 I agree with the Majority that the computers were seized pursuant to the *464 March 2013 warrant, but searched pursuant to the August 2015 warrant. However, I disagree with its conclusion that both the seizure and search were lawful. The Fourth Amendment not only guarantees freedom from unreasonable searches, but freedom from unreasonable seizures. United States v. Jacobsen , 466 U.S. 109, 113, 104 S. Ct. 1652, 1656, 80 L.Ed.2d 85 (1984). The Majority provides no justification for its assertion that the 2013 seizure was lawful. The Majority addresses none of Neiss's arguments that the 2013 warrant lacked particularity, was overbroad, and did not validly authorize the seizure of the computers because it set forth no facts from which the District Court could have found probable cause to seize the computers.
¶106 Under the Fourth Amendment to the United States Constitution and Article II, Section 11, of the Montana Constitution, "[n]o warrant to search any place, or seize any person or thing shall issue without describing the place to be searched or the person or thing to be seized, or without probable cause, supported by oath or affirmation reduced to writing." "Specificity has two aspects: particularity and breadth. Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." United States v. Towne , 997 F.2d 537, 544 (9th Cir. 1993) (citation omitted). The 2013 warrant is problematic in both aspects: It lacks particularity because it provides no guidance as to the type of evidence sought, and it is overbroad because the warrant is silent as to any connection the computers may have had to the homicide under investigation. Since the question raised by the 2013 warrant is the lawfulness of the seizure of the computers, rather than the lawfulness of the much later search, I focus my attention on Neiss's position that the warrant was overbroad and thus lacking probable cause to support the seizure of the computers in this case.
¶107 A search warrant must limit the scope of a search to the specific areas and things for which there is probable cause to search. By doing so, "the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." However, "the scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe that it may be found." Maryland v. Garrison , 480 U.S. 79, 84, 107 S. Ct. 1013, 1016, 94 L.Ed.2d 72 (1987) (citation and internal quotation omitted). As the U.S.
***44 Supreme Court stated in United States v. Ross , 456 U.S. 798, 824, 102 S. Ct. 2157, 2172, 72 L.Ed.2d 572 (1982), "Just as probable cause to believe that a stolen lawnmower may be found in a garage will not support a warrant to search an upstairs bedroom, probable cause to believe that undocumented aliens are being transported in a van will not justify a warrantless search of a suitcase."
¶108 Also, there must be a nexus between the item to be seized and criminal behavior. State v. Quigg , 155 Mont. 119, 132, 467 P.2d 692, 699 (1970). The 2013 warrant application set forth a list of items to be seized, including, "Cell phones, IPads, computers and/or other electronic devices and the information contained therein' [sic]." The application described no nexus between the presence of computers within Neiss's home and Greene's homicide. In fact, as set forth more fully below, the only justification for searching the computers that law enforcement ever articulated came about as a result of either the 2013 search in which the computers were seized or in a later 2014 search of Neiss's shop building. None of the allegations recited in the application described the use of a phone or electronic device. All of the confrontations between Neiss and Greene described in the application occurred in person. There is no instance of Neiss calling, texting, or emailing described in the application, nor are there any allegations that Neiss used social media to pursue his dispute with Greene, nor any allegations that Neiss used the computers in any way to further the conflict. Although on appeal the State maintains that the dispute between Neiss and Greene could have spilled over into social media, this is not suggested in the warrant application and there is no evidence that Neiss even maintained any social media or email accounts.
*465 ¶109 In this case, the warrant application listed computers among the items to be seized for unknown reasons. Although the District Court concluded that the ubiquity of electronic and social media communication established a reason to seize them, the warrant application only recited facts supporting the seizure of physical objects: A seizure and search of the computers was not going to yield tennis shoes, guns, ammunition or casings, a silencer, nor blood, tissue, or DNA evidence.[1]
***45 ¶110 Although the Majority relies upon Lacey to argue that the lawfulness of a seizure is irrelevant so long as any subsequent search of the unlawfully seized items occurs pursuant to a second, lawful search warrant, the Majority's position is inconsistent with the holdings of Quigg , State v. Seader , 1999 MT 290, ¶¶ 14-16, 297 Mont. 60, 990 P.2d 180 (evidence seized pursuant to an overbroad warrant must be suppressed), and Hauge v. Dist. Court , 2001 MT 255, ¶ 19, 307 Mont. 195, 36 P.3d 947 (evidence seized pursuant to an overbroad provision within an otherwise lawful warrant must be suppressed), which require the seizure itself to also be lawful. I disagree that the seizure was lawful and, as explained below, I further disagree with the Majority's position that an unlawful seizure can be cured after the fact by a post-seizure application for a search warrant.
B. The 2015 search warrant application lacked particularity and probable cause.
¶111 Because I would conclude the computers were not lawfully seized under the 2013 warrant, my analysis of the search of the computers under the 2015 search warrant starts from a different place than the Majority's analysis. First, I do not agree with the Majority that Neiss did not properly preserve for appeal his argument that the 2015 search warrant was invalid on its face and lacked particularity. In its appellate brief, the State asserts Neiss did not argue this in the District Court. However, Neiss presented these arguments to the District Court. In fact, he devoted nearly two full pages of his eight-page September 9, 2015 Motion to Suppress Evidence Obtained from Search of Computers and Brief in Support to these arguments, stating in part:
[W]hen applying for the [2015] warrant, the State has failed to allege sufficient facts for this Court to find probable cause for the search.... [T]he State makes a vague reference in the search warrant application to a "consideration" ... as to whether the computers "had been utilized to access the internet, store documents or complete other tasks...." [This] means nothing.
The statement that computer print outs were located during the search ... provides little to establish probable cause, especially in the absence of any information as to what the computer print outs may have revealed.... The search warrant is void of specific facts.... [W]ithout including information as to what documents were printed, this information does nothing to support a finding of probable cause.
The statement that "Investigators were interested to know if the computers had been used to obtain information about silencers ***46 or other firearms[-]related questions ..." also does not provide probable cause that evidence will be located on the computer[s]. What investigators were interested to know is irrelevant.... It[']s devoid of facts and fails to support a finding of probable cause.
Finally, the State provides information that investigators "were aware" that ... the Defendant hand wrote a letter detailing his history with Greene. From this, even though the letter was handwritten, the Investigators "thought it was possible that Neiss may have kept a journal or log of events on one or more of the computers." ... [T]he "possibility" of keeping a journal on a computer again does not provide any facts to support a finding of probable cause to search the computer. While *466 an investigator does not need to be certain evidence will be located-a mere "possibility" is insufficient ... to establish probable cause.
¶112 After Neiss filed this motion and brief, on September 14, 2015, the District Court convened an in-chambers pretrial conference. Noting it was aware Neiss had offered several arguments regarding the seizure and search of the computers, the court asked Neiss's counsel to enumerate the issues on the record. Along with other issues, counsel stated, "on the eve of trial deciding to get a second search warrant to have [the computers] searched, and then, again, that search warrant not being specifically particularized as to the reason to search it at all." In post-conference supplemental briefing, Neiss again argued to the District Court that the existence of a handwritten letter, which the 2015 search warrant application used as a basis for probable cause, could not provide probable cause to search computers.
¶113 Because I conclude Neiss properly preserved these arguments for appeal, I would consider their merits.
¶114 The 2015 application for search warrant offers three bases to search the computers: the discovery of a handwritten letter during the March 2013 search, "computer print outs" which investigators "noted" during the March 2013 search "that would indicate that someone had been actively using a computer," and the discovery of a possible homemade silencer during an August 2014 search, which made investigators "interested to know" if anyone had used the computers to search for information about silencers or other firearms-related questions. I find these bases, without more, inadequate to establish probable cause under Hauge . There, we stated:
The Fourth Amendment to the United States Constitution requires that a search warrant "particularly describe the place to be searched, and the persons or things to be seized." While Article II, Section 11 of the Montana Constitution does not use the word ***47 "particularly," this Court has held that the Montana Constitution does impose a particularity requirement identical to that under the United States Constitution. See State v. Ballew (1973), 163 Mont. 257, 261, 516 P.2d 1159, 1161-62. In addition, § 46-5-221(4), MCA, requires that a judge issue a search warrant that "particularly describes who or what is to be seized."
The United States Supreme Court has determined that the requirement of particularity serves to prevent a "general, exploratory rummaging in a person's belongings." Coolidge v. New Hampshire (1971), 403 U.S. 443, 467, 91 S. Ct. 2022, 2038, 29 L.Ed.2d 564. And that nothing regarding what is to be taken should be left to the discretion of the officer executing the warrant. Stanford v. Texas (1965), 379 U.S. 476, 485, 85 S. Ct. 506, 512, 13 L.Ed.2d 431.
Hauge , ¶¶ 13-14.
¶115 Under the facts of the present case, law enforcement conducted a "general, exploratory rummaging" of Neiss's computer based on thin justification. First, rather than supporting the theory that Neiss may have kept a journal or other document on the computer regarding his conflict with Greene, the existence of a handwritten letter suggests Neiss did not use a computer for such things. I therefore do not find this statement provides probable cause for a computer search. More compellingly, when the State sent the computers for analysis after obtaining the search warrant, the State asked the expert only to examine the computers for information on Internet searches and web pages visited. It did not ask the expert to search for documents such as a journal that Neiss may have kept on the computers. Either the State did not genuinely believe the handwritten letter indicated similar information might be found on the computers, or the State did not believe such information would prove useful to its investigation. Since the State did not even attempt to locate the information it used as a basis for its search warrant, I would find this to be a pretext unworthy of consideration as a legitimate justification for the search warrant.
¶116 Next, during the hearing on Neiss's motion to suppress the computer evidence on December 7, 2015, Detective Frank Fritz testified that these "print outs," which were not enumerated in the application, consisted *467 of a single "printout on an Internet search for a lathe," but investigators did not seize this document, or any other computer printout, and he could not recall seeing any other printouts during the March 2013 search. Neiss offered a witness whose unrefuted testimony was that in the fall of 2013, he sold Neiss a metal lathe appropriate for use in an automotive shop for such things as ***48 making drive shafts and turning brake drums and brake rotors, but that would not be useful for manufacturing a silencer or suppressor. The fact that Neiss, an auto mechanic, apparently searched on the Internet for a tool useful for automotive purposes does not provide probable cause to search the computer for evidence he used the computer to conduct Internet searches about silencers or suppressors. Furthermore, the uncontroverted evidence is that Neiss purchased a lathe in the fall of 2013; even if he had wanted a metal lathe to attempt to manufacture a silencer or suppressor, there is no evidence he owned a metal lathe until several months after Greene's death-long after his purported need for a silencer had passed.
¶117 Finally, a mere "interest[ ] to know" if Neiss may have searched the Internet for information on silencers in no way provides anything beyond baseless speculation. By this point in the investigation, officers had interviewed multiple witnesses, including Neiss's son, who described Neiss attaching something to the barrel of a gun before firing it. None of those witnesses apparently mentioned anything about Neiss conducting Internet research for this purpose. Given Neiss's well-known enthusiasm for guns and for tinkering with projects in his well-stocked workshop, there is no reason to assume Neiss needed to conduct Internet research in order to build a homemade silencer or suppressor.
¶118 Equally as troubling, as Neiss points out, is that the information which officers relied upon to apply to search the computers for Internet research was obtained after a search of Neiss's workshop in 2014. As Neiss argues, the State cannot seize a person's possessions prospectively and wait for probable cause for a search to develop a year or more later. Even assuming a colorable argument could be made that investigators properly seized the computers to preserve the evidence while they applied for a warrant to search them, I would conclude the search warrant was invalid because of the approximate one-year delay in applying for it after uncovering this evidence for reasons more fully set forth below.
¶119 The Majority's reliance on Lacey is misplaced because it misapprehends this Court's basis for upholding the search in Lacey . In Lacey , officers relied on the consent of Lacey's girlfriend to seize Lacey's laptop. Lacey , ¶ 5. Prior to a search of the laptop, Lacey admitted to law enforcement that the laptop contained child pornography. Lacey , ¶ 15. Officers then obtained a warrant to search the laptop. Lacey , ¶ 18. Lacey moved to suppress the evidence recovered, arguing the laptop had been illegally seized because his girlfriend had no authority to consent. Lacey , ¶ 19. The District Court ***49 disagreed, ruling that Lacey's girlfriend had the authority to consent to the seizure and search. Lacey , ¶ 20. On appeal, after concluding that Lacey's girlfriend did not have the authority to consent to the seizure, this Court held that the evidence on the laptop was admissible under the "inevitable discovery" doctrine. Lacey , ¶ 52. Under this exception, evidence the State initially obtains illegally may be used against a defendant if the State shows that the evidence would have been inevitably discovered despite a constitutional violation. Lacey , ¶ 55 (citations omitted). The Court based its decision that the laptop evidence was subject to inevitable discovery because it concluded that, had the police not seized the laptop pursuant to Lacey's girlfriend's consent, the evidence they uncovered during a search of Lacey's residence conducted pursuant to a search warrant the following day would have provided probable cause to seize the laptop. Lacey , ¶ 56.
¶120 The Majority glosses over Lacey's reliance on the inevitable discovery doctrine and focuses on the fact that the search warrant obtained after the seizure was a lawful warrant. However, this Court did not decide that the laptop evidence was admissible in Lacey because the warrant was lawful, but *468 rather because the it fell under an exception to the "fruit of the poisonous tree" doctrine because the warrant was not clearly lawful. Lacey , ¶ 52. "Inevitable discovery" is a much harder sell in the present case. Unlike in Lacey , where law enforcement uncovered evidence pursuant to a valid search warrant to provide probable cause for searching the laptop one day after seizing it, in Neiss's case, law enforcement relied on evidence it uncovered over a year after seizing the computers in order to allege probable cause in its application for the 2015 warrant. The inevitable discovery doctrine is stretched beyond recognition if we allow law enforcement to unlawfully seize someone's possessions and then hold onto them for years while waiting to uncover probable cause to search those possessions.
¶121 For these reasons, I would conclude the District Court erred in denying Neiss's motion to suppress the search of the computers because the 2015 warrant lacked probable cause.
C. The two-and-a-half-year delay in applying for a warrant made the search unreasonable.
¶122 As to the delay, because the Majority determined the 2013 seizure was valid, it found Mitchell inapplicable. However, since I would hold the 2013 seizure was not pursuant to a valid search warrant, I would apply Mitchell to this case.
¶123 In Mitchell , federal agents entered the defendant's residence with his consent and spoke with him about a child pornography ***50 investigation. The defendant admitted one of the home's computers "probably" contained child pornography. The agents seized a hard drive without a warrant. Mitchell , 565 F.3d at 1349. Twenty-one days later, one of the agents applied for and received a warrant to search the hard drive, and upon searching it, discovered child pornography. Mitchell , 565 F.3d at 1349-50. The defendant's motion to suppress was denied. Mitchell , 565 F.3d at 1350. The Eleventh Circuit Court of Appeals reversed, finding the 21-day delay in obtaining the warrant, which the applying agent explained occurred because he was gone for two weeks and did not see any urgency to apply for the warrant, to be unreasonable. It held unreasonable delay in securing a warrant renders a seizure unconstitutional. Mitchell , 565 F.3d at 1350. Finding no compelling justification for the delay, the court explained:
Computers are relied upon heavily for personal and business use. Individuals may store personal letters, e-mails, financial information, passwords, family photos, and countless other items of a personal nature in electronic form on their computer hard drives. Thus, the detention of the hard drive for over three weeks before a warrant was sought constitutes a significant interference with Mitchell's possessory interest.
Mitchell , 565 F.3d at 1351. The Court of Appeals found it particularly significant that the seized item was a computer, noting that ordinarily, if a search reveals nothing incriminating, the sooner the warrant issues, the sooner the property owner's possessory rights can be restored, but "this consideration applies with even greater force to the hard drive of a computer, which is the digital equivalent of its owner's home, capable of holding a universe of private information." Mitchell , 565 F.3d at 1352 (citations and internal quotation omitted).
¶124 Relying in part on Mitchell , in United States v. Laist , 702 F.3d 608, 614 (11th Cir. 2012), the Court of Appeals set forth three non-exhaustive factors to consider in determining whether the delay in obtaining a search warrant was unreasonable: the nature and complexity of the investigation and whether overriding circumstances diverted law enforcement personnel to another case; the quality of the warrant application and the amount of time such a warrant would take to prepare; and any other evidence proving or disproving law enforcement's diligence in obtaining the warrant.
¶125 On May 14, 2015, this case was set for trial to begin September 14, 2015. However, on the morning of trial, the District Court convened an in-chambers pretrial conference prior to voir dire to discuss pending issues, including Neiss's motion to suppress the computer evidence. In arguing for suppression, Neiss's counsel argued the State unreasonably *469 ***51 held the computers for two and a half years prior to searching them pursuant to a last-minute warrant. Since the State did not provide Neiss with the results of its computer forensic investigation until August 28, 2015, Neiss had had insufficient time to retain an expert to review the evidence. At this conference, the State admitted it had forgotten the computers were seized during the March 2013 search, and it was not until April or May 2015, while reviewing evidence with the defense, that it realized the computers were in its custody. The State further claimed it decided not to act at that point because the District Court had not yet ruled on the validity of the March 2013 search. As to Neiss's allegation that the late disclosure allowed him insufficient time to retain an expert witness, the State argued the remedy should be a continuance and not exclusion. After further discussion, and at the recommendation of the court, the parties stipulated to continuing the trial to provide the court time to rule on the pending motions.
¶126 On December 7, 2015, the District Court held an evidentiary hearing on Neiss's motion to suppress the computer evidence. Detective Fritz also testified at that hearing and offered no explanation for the two-and-a-half-year delay to search the computers.
¶127 Applying the Laist factors here to evaluate the reasonableness of the delay, while this could arguably be construed as a complex investigation, there is no evidence law enforcement was diverted to another case, nor was the complexity a genuine factor in the delay to seek a search warrant for the computers, as the State admitted the delay occurred because it forgot to search the computers sooner and then it decided to wait and see how the District Court ruled on a pending suppression motion. In other words, like the agent in Mitchell , it saw no urgency to seek a warrant. As to the second factor, as set forth more fully above, the warrant contained insufficient information to constitute probable cause and was therefore not of particularly noteworthy quality. Additionally, nothing in the contents of the search warrant application justifies the State's decision to wait from April or May 2015, when it realized it had the computers, until August 2015, when it applied for a warrant to search them. As to the third factor, the evidence presented indicates that law enforcement was not diligent in pursuing this search warrant. They allowed the computers to sit in custody for years prior to filing, and even once they recognized the omission, they failed to act with any urgency to search. Although these factors are non-exhaustive, they all clearly preponderate against the State and therefore support the conclusion that the 2015 search was unreasonable.
***52 ¶128 The State's counter-arguments are not persuasive. First, it maintained there was no unreasonable delay in searching because there were "only a few days gap between the issuance of the second warrant and the analysis of the computers." However, the time between the issuance of the 2015 warrant and the search is not the gap at issue. Next, it argues the computers were validly seized. However, even pursuant to a valid seizure, items cannot be held indefinitely. This is particularly remarkable in this case, where the State relied on evidence it obtained after it seized the computers to allege probable cause to search the computers. Next, the State argues the 2015 warrant application was unnecessary, but only pursued out of an abundance of caution. Clearly, the officers believed the additional warrant was necessary-especially since no justification for searching the computers exists in the 2013 search warrant application-or they would not have sought it.
¶129 For these reasons, I would hold that the District Court erred in denying Neiss's motion to suppress the computer searches because the State's two-and-a-half-year delay in searching the computers was unreasonable.
D. Admitting the computer searches into evidence was not harmless error.
¶130 A cause may not be reversed by reason of any error committed by the trial court against the convicted person unless the record shows that the error was prejudicial. Section 46-20-701(1), MCA. Once a convicted person establishes evidence was erroneously admitted and has alleged a reasonable possibility exists that the inadmissible evidence *470 might have contributed to his conviction, the burden is on the State to demonstrate the error was not prejudicial. State v. Van Kirk , 2001 MT 184, ¶ 42, 306 Mont. 215, 32 P.3d 735 (citation omitted). Reversal is not required where there is no reasonable possibility that inadmissible evidence might have contributed to a conviction. Van Kirk , ¶ 47.
¶131 Neiss maintains that in a case built entirely upon circumstantial evidence, the State's reliance on the computer evidence was substantial. In the absence of a murder weapon, eyewitnesses, DNA evidence, fingerprints, definitive gunshot residue test results, or even tying Neiss to the footprints found on Greene's property, the State used the computer's search history to argue that Neiss planned Greene's homicide.
¶132 Conversely, the State argues it presented a strong circumstantial case, and Neiss's counsel skillfully undercut the value of the computer evidence such that it could not possibly have ***53 contributed to his conviction.[2]
¶133 When considering tainted evidence, our focus is on the quality of the tainted evidence and its impact upon the fact-finder. State v. Santillan , 2017 MT 314, ¶ 35, 390 Mont. 25, 408 P.3d 130 (citations omitted). This inquiry does not require the Court to definitively state whether the tainted evidence actually influenced the jury's decision to convict, but requires the State to demonstrate there is no reasonable possibility that the tainted evidence might have contributed to the conviction. State v. Reichmand , 2010 MT 228, ¶ 23, 358 Mont. 68, 243 P.3d 423 (citation omitted) (emphasis in original).
¶134 To meet its burden of demonstrating that the error in admitting the computer evidence did not prejudice Neiss, the State points to the following evidence, which it maintains secured Neiss's conviction: Neiss had a motive to kill Greene; Neiss had the opportunity to kill Greene; cartridge cases fired from the murder weapon were located near Neiss's home; shoeprints led to and from Neiss's property; Neiss had gunshot residue on his face and hands when he was detained on the night of Greene's death; evidence indicated the shooter used a suppressor and Neiss's son testified that Neiss had used a homemade suppressor; and, an item alleged to be a homemade suppressor was entered into evidence.
¶135 The evidence the State highlights is not so unequivocal as the State would suggest. Although the State argued Neiss had the opportunity to kill Greene, Neiss's son and mother both provided an alibi, testifying Neiss was at home watching a movie with his son at the time of Greene's death. It is true investigators found cartridge cases near Neiss's home that were likely fired from the murder weapon. However, the evidence demonstrated that many individuals, including Greene before he and Neiss had a falling-out, shot firearms on Neiss's property. Neiss's property had a fence post which he and his guests used for target practice. Travis Spinder, the supervisor of the firearm and toolmark section of the State Crime Lab, testified that investigators found over 120 .40-caliber bullet casings on Neiss's property. Of those, 11 had markings consistent with being ejected from the murder weapon. However, Spinder further testified that these 11 casings were of a different manufacture than the five casings retrieved ***54 from the crime scene. These casings were also weathered and Spinder opined they had been exposed to the elements "for a while," requiring multiple cleanings before he could compare them. Aside from the presence of the casings, the State offered no evidence Neiss owned a .40-caliber weapon or that he was the individual who fired the .40-caliber gun on his property.
¶136 Although the State's theory was that Neiss manufactured a homemade suppressor and used it to shoot Greene, the State's theory was based solely on the lack of witnesses who heard gunshots. However, Manda Schaible, Greene's girlfriend who discovered his body, initially informed the 911 dispatcher that she had heard a gunshot, and Detective Bancroft, who interviewed Schaible on *471 the night of the murder, also testified Schaible told him she heard a gunshot. At trial, Schaible insisted she did not hear any gunshots, testifying that shortly after turning off loud music, she heard a "metal-sounding loud noise" that she did not investigate.
¶137 Neiss's son testified Neiss used to own three guns-a shotgun, a .22, and a non-functioning .45-but Neiss got rid of the guns three or four years before Greene's death. On one occasion, Neiss attached a flashlight tube to the barrel of the .22 and it made a "whew" sound when he shot it. Thus, not only was there no direct evidence a suppressor was used in Greene's murder, there is no substantial evidence that Neiss ever owned a .40-caliber gun, and the only evidence outside of the computer searches that connects Neiss to a suppressor of any kind is a single occasion when he fired a .22 through a flashlight tube some three or four years earlier.
¶138 As to the shoeprint evidence, the State proved that footprints found on Greene's property were made by a pair of men's Nike tennis shoes. No tennis shoes were found when Neiss's home was searched. No witness testified that Neiss owned tennis shoes. Even the police who detained Neiss on the night of Greene's death were unable to state that Neiss was wearing tennis shoes. Neiss's mother testified that Neiss did not own tennis shoes in March 2013. Neiss's girlfriend testified he typically wore work boots. Moreover, nothing tied these footprints to the murder. Investigators, who were not trained in footprint analysis, saw footprints on Greene's property going "in the general direction" of Neiss's property. They did not locate any footprints actually leading up to the property boundary, nor did they look for any footprints beyond the boundaries of Greene's property. They further did not definitively rule out the possibility that the footprints could have been left by any of the numerous visitors Greene had had on the day of his murder.
***55 ¶139 Next, the evidence of gunshot residue on Neiss's face and hands was anything but conclusive. Bahne Klietz, the gunshot residue expert for the State Crime Lab, testified that gunshot residue typically consists of lead, barium, and antimony in a spherical or melted shape. A particle that is "characteristic of" gunshot residue fits that description. A particle that is "indicative of" gunshot residue only partially fits that description. Klietz found thousands of particles on Neiss which contained various metals, and Klietz conceded that the majority of these particles appeared "environmental or occupational." Of the 3,400 metallic particles Klietz found on Neiss's right hand, one particle was indicative of gunshot residue. Klietz also found three particles characteristic of gunshot residue and six particles indicative of gunshot residue on Neiss's left hand, and three particles characteristic of gunshot residue and one particle indicative of gunshot residue on his face.
¶140 However, Klietz also found four particles indicative of gunshot residue on Schaible's right hand, while Neiss's girlfriend had five particles characteristic of gunshot residue and six particles indicative of gunshot residue on her right hand, and four particles characteristic of gunshot residue and one particle indicative of gunshot residue on her left hand. Moreover, Greene's friend Ronald Mikel testified that Schaible called him hours after Greene's murder and asked if gunshot residue would wash off in the shower.
¶141 Most importantly, none of the evidence the State points to covers the same ground as the computer evidence. The State offered the computer evidence for the purpose of proving that Neiss planned to kill Greene. In its opening statement, it declared:
FBI Agent Matt Salacinski ... will tell you that on one of those computers, he found a number of searches that were done on that computer in the two months immediately prior to [Greene's] death.
Those searches and those websites viewed include websites on the manufacture and use of suppressors and videos showing how to manufacture suppressors and the effectiveness of suppressors. He will also tell you that in those two months there were searches on the Defendant's computer and websites visited on the legal definition of murder, and videos and websites showing scenes and videos that were caught on different cameras of murder, *472 and a Wikipedia page that included a number of murder trials. He also looked up-someone on that computer looked up the legal definition of self-defense.
¶142 On the witness stand, Salacinski, who conducted a forensic ***56 examination of the seized computers, testified that he searched for 23 keywords selected by the investigators in web browser use and Internet searches. He produced reports of the keywords he found in the browser history for January and February 2013, including "silencer" and "murder." Salacinski later conducted further examination with some additional keywords, including "suppressor." The jury was shown three exhibits listing the results of Salacinski's investigation. Two exhibits listed visited web pages which contained one or more of the keywords. The web pages were listed by URL, title, date and time visited, and the number of times each page was visited. Most websites listed were for YouTube videos of silencers or suppressors with titles such as "Suppressed beretta" and "10/22 SBR with silencer." The results also listed two Billings Gazette articles about murder trials, as well as searches for the definition of "first degree murder." The third exhibit listed three occasions on which someone had used a search engine to look for "suppressed."
¶143 We developed our modern harmless error analysis in Van Kirk . There, we held, in cases of trial error, we would utilize the "cumulative evidence" test to determine if the State had demonstrated that the error was not prejudicial to the defendant. Van Kirk , ¶¶ 43-44. Under this test, the State must direct us to admissible evidence that proved the same facts as the tainted evidence, and must also demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction. Van Kirk , ¶ 44. We further stated, "We readily acknowledge that there will be cases in which there was no other admissible evidence proving the same facts that the tainted evidence proved, making the burden of producing cumulative evidence of the fact impossible." Van Kirk , ¶ 45. The present case is such a case. The State used the computer evidence to attempt to prove Neiss had spent time planning Greene's murder. The State points to no other evidence that demonstrates Neiss planned to shoot Greene with a silenced or suppressed firearm.
¶144 Under the harmless error standard of Van Kirk , the State has failed to demonstrate there is no reasonable possibility that inadmissible evidence might have contributed to Neiss's conviction. For this reason, I would reverse and remand for a new trial.
Justice Dirk Sandefur joins the Concurring and Dissenting Opinion of Justice Gustafson.

Neiss does not challenge the validity of the August 12, 2014 warrant.

The dissent contends Neiss devoted nearly two pages in a motion to suppress to an argument that the August 2015 warrant lacked particularity. However, the paragraphs the dissent cites relate instead to Neiss's objection about whether probable cause supported the warrant. Dissent, ¶ 112. Furthermore, defense counsel's cursory remark during the September 14, 2015 hearing that the warrant was not "specifically particularized as to the reason to search" conflates probable cause with particularity because only probable cause relates to the reason for a search. Neiss's supplemental briefing following the conference-by leaving out any argument about the warrant's particularity-confirms this. Whether a warrant lacks particularity and whether probable cause supports it are distinct issues. Neiss may not change theories about the warrant's alleged deficiencies on appeal. See Kuneff , ¶ 26.

This analogy is not unique to Montana. The Colorado Supreme Court, for example, stated that the "container rationale is equally applicable to nontraditional, technological 'containers' that are reasonably likely to hold information in less tangible forms." People v. Gall , 30 P.3d 145, 153 (Colo. 2001) ; see also People v. Swietlicki , 361 P.3d 411, 414 (Colo. 2015) ("We have previously characterized computers as containers for purposes of search and seizure law.").

In 2005, Thomas K. Clancy, then the director of the National Center for Justice and the Rule of Law and a visiting professor at the University of Mississippi School of Law, observed:
Many courts view data in computer storage as a form of a document. Hence, a warrant that authorizes a search for "writings" or "records" permits a search of computer files. This is to say that the government need not know the exact "form that records may take." Indeed, this view asserts that there is "no principled distinction between records kept electronically and those in paper form" and, hence, there is "no justification for favoring those who are capable of storing their records on computer over those who keep hard copies of their records." In both instances, consistent with [Andresen v. Md. , 427 U.S. 463, 96 S. Ct. 2737, 49 L.Ed.2d 627 (1976) ], "innocuous documents may be scanned to ascertain their relevancy" in "recognition of the reality that few people keep documents of their criminal transactions in a folder marked 'crime records.' "
Courts adopting this view have often analogized computers to filing cabinets or to containers ....
Thomas K. Clancy, Symposium: The Search and Seizure of Computers and Electronic Evidence: The Fourth Amendment Aspects of Computer Searches and Seizures: A Perspective and a Primer , 75 Miss. L.J. 193, 197-98 (2005) (internal footnotes omitted).

Section 46-5-112, MCA, which went into effect in 2017, states, "[A] government entity may not obtain the stored data of an electronic device without a search warrant issued by a court upon a finding of probable cause." Although the statute went into effect well after the events in Neiss's case, we note that when officers secured the August 2015 Warrant they complied with the statute's provisions.

Although the warrant also sought "Indicia of Occupancy/Ownership in the form of documents, receipts, statements, mail, billing statements, letters, notes, vehicle registration/titles," neither law enforcement, the parties, nor the District Court have suggested that any of these items could potentially be found on the computers, nor did the State ultimately search the computers for evidence of any of these items.

While the State minimizes the value of this evidence in support of its argument here, in its appellate brief, the State found this evidence valuable enough to point out to this Court, reciting in detail the computer searches and website browsing history its investigation uncovered under the heading "Other evidence of Neiss's guilt ." (Emphasis in original.)