FILED

05/04/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0696

DA 18-0696

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 110N

STATE OF MONTANA,

Plaintiff and Appellee,

v.

SARAH LOUISE CARPENTER, a/k/a
SARAH LOUISE SKINNER,

Defendant and Appellant.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DC-17-93
Honorable Matthew J. Cuffe, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Chad Wright, Appellate Defender, Alexander H. Pyle, Assistant Appellate
Defender, Helena, Montana

For Appellee:

Austin Knudsen, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

Marcia Boris, Lincoln County Attorney, Jeffrey Zwang, Deputy County
Attorney, Libby, Montana

Submitted on Briefs:  March 17, 2021

Decided:  May 4, 2021

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent.  Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2     Sarah Louise Carpenter appeals from her August 15, 2018 conviction by a jury of the offense of Deliberate Homicide pursuant to § 45-5-102, MCA.  We affirm.

¶3     In 2016, Sarah Louise Carpenter (Carpenter) and Travis Gillett (Gillett) lived together in Kellogg, Idaho, with their infant, A.G.  The couple had multiple domestic disputes leading to Gillett's arrest in late November 2016.  Carpenter told a childhood friend with whom she had recently reconnected, Ezra Skinner (Skinner), that Gillett was in jail, leading to Skinner going to visit Carpenter.  Skinner understood Carpenter's relationship with Gillett to be rocky at that point, and Carpenter related to Skinner that Gillett had been beating her and had not been adequately helping to take care of their child. Skinner and Carpenter soon moved into a trailer together in Ponderay, Idaho.  Skinner testified that when Gillett came to the trailer, Skinner witnessed Gillett and Carpenter argue about custody of their child.  Skinner later told law enforcement that, on multiple occasions, he awoke to find Gillett standing over him and Carpenter in bed.

¶4     Carpenter had a tubal pregnancy that had to be terminated.  She testified that Skinner seemed to be upset by this news and that she told him not to worry because he was not the

2

father. In January 2017, Gillett was kicked out of his shelter in Coeur d'Alene. Carpenter testified at trial that she told Skinner to leave her trailer so she could bring Gillett home. Carpenter testified that this meant that Skinner would have to return to his parents' property to live without running water or electricity.

¶5     Carpenter picked Gillett up in Coeur d'Alene the evening of January 13. Around 10:30 p.m., Carpenter texted Skinner that the "snake," their term for Gillett, was in her vehicle but not cooperating and subsequently asked Skinner to follow them. At 2:21 a.m., Carpenter texted Skinner that she was in bed and that Gillett was snorting pills.

¶6     Skinner testified at trial that, at Carpenter's urging, he then purchased duct tape and arrived at the trailer where he helped restrain Gillett—who was under the influence of drugs—with duct tape, a blanket, and a rope. Skinner testified that they put Gillett and A.G. into Carpenter's vehicle and proceeded to drive through the night, traversing through northern Idaho and northwestern Montana, stopping at elevated points to consider throwing Gillett off. After dawn, they stopped by the side of the road and Skinner got out to relieve himself. Carpenter let Gillett out of the vehicle, cut his bonds, and ordered Gillett to take off a special black and white "Metal Mulisha"[1] shirt that belonged to her daughter. After granting Gillett's request for a cigarette, Carpenter then ordered Gillett to descend the snowy roadside embankment, pointed Skinner's Glock .40 at him, and shot him multiple times.

---

[1] Skinner testified that the "Metal Mulisha" is a motorcycle stunt group that performs around the United States.

¶7 Skinner testified that the couple then drove off but returned shortly thereafter to retrieve Carpenter's food assistance card that she had dropped at the scene. Skinner observed Carpenter standing a couple feet to the side of where Gillett was lying at the bottom of the embankment and shoot him in the head before scrambling back up the slope to the vehicle. At Carpenter's request, the couple then went to the Dirty Shame Saloon in Yaak for a drink. While driving home, Skinner lost control of the vehicle and went off the road. He moved to the passenger seat where he remained while Carpenter flagged down passerby who pulled them out.

¶8 Carpenter testified at trial to a different version of the events leading to Gillett's death. According to Carpenter, she and Gillett were about to have sex when Skinner arrived at her home, bound Gillett, put him in his vehicle, and left, returning hours later without Gillett. Skinner then drove Carpenter to the Dirty Shame Saloon in Yaak, where he told Carpenter where Gillett's body was located.

¶9 The parties agree that Carpenter subsequently engaged in a lengthy cover-up attempt. While out with Skinner, Carpenter sent a text message to herself from Gillett's phone saying that he was breaking up with her. The next day, Carpenter contacted Gillett's sister over Facebook messenger, saying that Gillett had gone to a drug deal and had not returned, but that some of his items had been dropped off at her trailer. Carpenter claimed to have found a piece of paper in Gillett's backpack with "mile marker 48 drop solo jack rd yaak" written on it and inquired about the roads in the Yaak area, which she said she had never been to.

¶10 Carpenter called the Ponderay Police Department and reported Gillett as missing. Later that night, Carpenter again messaged Gillett's sister to say that she would be going to look for Gillett the next day. While driving to Montana, Carpenter called the Lincoln County dispatch, repeating her story about Gillett going missing and stating that she had never been to the Yaak area. Carpenter stopped at the Yaak Mercantile, where she inquired about Gillett and asked for directions to mile marker 48.

¶11 While driving up Yaak River Road, Carpenter encountered two hunters and asked for directions to Solo Jo Road or mile marker 48. She said she had never been to the Yaak area and volunteered that her boyfriend had been snowmobiling and was missing. Because the roads were bad, the hunters offered to follow her in their vehicle. They followed Carpenter until she stopped, without hesitation, and exited her vehicle right at mile marker 48. As one of the hunters walked up to her and looked over the bank, he saw Gillett's body below.

¶12 After the party returned to the Yaak Mercantile and called law enforcement, Carpenter repeated her story that someone had returned Gillett's wallet and phone to her residence after he went missing during a delivery, that she had subsequently found the "solo jo" road note[2] in his backpack, and that she had never been to the Yaak area. Carpenter told law enforcement that she found Gillett's body after seeing "something bigger than a game trail" going down from the side of the road.

---

[2] Carpenter would later admit at trial to having forged this note.

5

¶13    A police report initially indicated that the path through the snow leading to Gillett's body contained only a single set of tracks. However, subsequent ballistics analysis determined that the fatal shot was fired from behind Gillett's head at a distance of less than three feet, such that the shooter must have also descended and climbed the same track through the snow.

¶14    Law enforcement obtained the Dirty Shame Saloon's surveillance video, showing Carpenter and Skinner there together on January 14, 2017. The video shows Skinner scanning the bar and then looking directly into the camera, at which point he can be seen mouthing what defense counsel interpreted to be the words "oh shit," before moving out of view. Skinner can be seen dressed in heavy clothing and work boots, while Carpenter appears to be wearing thin clothes and sneakers. Skinner bought new boots a few days later.

¶15    Investigators found a cigarette butt underneath Gillett's body and recovered .40 caliber bullets and cartridges from the scene that were determined to have been fired by a Glock. Skinner had a prior conviction for carrying a concealed .40 caliber Glock. On January 23, 2017, law enforcement reinterviewed Carpenter. On February 16, 2017, law enforcement executed search warrants for Carpenter's residence and vehicles belonging to Carpenter and Skinner. Officers seized a computer and phones as well as a .40 caliber round found in Skinner's vehicle.

¶16    When she was confronted with a photo from the Dirty Shame Saloon's surveillance video, Carpenter told law enforcement that she had travelled to the area with Skinner that day to look for Gillett and had lied about not having been to the Yaak area to avoid casting

6

suspicion upon herself. She told law enforcement that she had requested that Skinner go with her to search for Gillett on Friday night and that they had left for the Yaak area around 8:00 a.m. on Saturday. Carpenter told law enforcement that she had never seen Skinner's Glock.

¶17 On March 8, 2017, Detective Duane Rhodes (Rhodes) submitted an Affidavit of Probable Cause and Application for Search Warrant for digital material contained on the seized electronic devices. In another application, Rhodes sought a warrant directing Facebook Inc., a California corporation, to produce and deliver information stored in accounts belonging to Gillett, Carpenter, and Skinner. Both warrants requested access to substantially all of the information available on the devices and Facebook accounts and were not limited by timestamp. Both were granted.

¶18 In September 2017, the State charged both Carpenter and Skinner with Deliberate Homicide or, in the alternative, Deliberate Homicide by Accountability. While in jail, Carpenter attempted to pass a written note to Skinner saying that investigators had discovered that some of her texts to Skinner—including the one referring to Gillett as a "snake" who was not cooperating—had been deleted from her phone and that they needed to get their story straight.

¶19 On March 9, 2019, Skinner went into a meeting with Detective Rhodes knowing that a deal might be on the table and implicated Carpenter. Skinner stated that he, Carpenter, and Gillett had been on a long "booze cruise" through Idaho and Montana when Carpenter unexpectedly shot Gillett. Skinner entered into a plea agreement dismissing the deliberate homicide charge in exchange for his testimony and a plea of guilty to Tampering

7

with Evidence. In a subsequent interview on March 19, Skinner stated that Gillett had been bound with duct tape before being abducted and shot as part of a preexisting plan. During these interviews, Skinner explained that they had taken the murder weapon, his Glock .40, to a wedding in Texas where it was sold to a relative. This information led to the eventual recovery of the Glock from Texas by law enforcement.[3]

¶20 After Carpenter learned that Skinner had told law enforcement in his first interview that the murder weapon had been sold to a family member, Carpenter called her father and warned him that someone might try to contact the purchaser, her cousin. After she learned that Skinner had revealed that Gillett had been duct taped, she called her father and sister and asked them to retrieve Gillett's watch that would have had duct tape residue on it from her belongings.

¶21 Before trial, Carpenter moved to suppress the evidence obtained from searches of Carpenter's device and Facebook account, arguing that both search warrants were insufficiently particularized and that the District Court lacked the jurisdiction to direct a warrant to a California corporation. The District Court denied these motions.

¶22 At trial, the State admitted a photo recovered from Skinner's phone depicting Carpenter posing with a firearm that Skinner confirmed was the murder weapon, his Glock .40. The photo was taken before the murder but texted to Skinner on February 2, 2017. The State also admitted a text recovered from Skinner's phone, sent by Carpenter the day

---

[3] After learning that the weapon had been sold to one of Carpenter's relatives at a wedding in Texas, law enforcement examined messages from Carpenter's Facebook account and determined that Carpenter's cousin was the likely buyer. Skinner was able to confirm that the cousin was the buyer when shown a photo of him by law enforcement.

after Gillett's body was found, stating, "Hey, I fuckin love you and nothing will change that."

¶23 Exhibits derived from the contested search warrants of Carpenter's device and Facebook account data were admitted at trial. The State admitted photos found by searching Carpenter's Facebook account depicting Carpenter's daughter wearing a black "Metal Mulisha" shirt.[4]

¶24 The State also introduced several of Carpenter's Facebook messages apparently referencing Skinner's Glock, in which she describes spending a night with her "precious .40," says that she has Skinner's "pistol" because she asked to "hold on to it," and stating that she "ha[d] a few things" she could sell to her cousin, who later bought the Glock.

¶25 The State also introduced Carpenter's text message history which, when compared with Skinner's, demonstrated that messages had been deleted from her phone around the time of the murder. Carpenter testified that Skinner and his friend deleted the messages off of her phone.

¶26 At trial, Carpenter testified that her previous lies had been made in an effort to protect Skinner, as she was afraid of being alone and needed his help to support her children. During Carpenter's direct examination, defense counsel commented that a

---

[4] Defense counsel had previously cast doubt on Skinner's testimony that Gillett had removed a black and white "Metal Mulisha" shirt belonging to Carpenter's daughter immediately before being killed by pointing out that Gillett's body was found wearing a *red* "Metal Mulisha" shirt, raising the unlikely scenario that he was simultaneously wearing two different "Metal Mulisha" shirts prior to his death.

portion of Carpenter's Facebook messages admitted by the defense pertaining to Carpenter's fears of a custody battle with Gillett had cast her under suspicion.

¶27 In closing argument, the State focused on Carpenter's cover-up attempts and changing alibis. The defense pointed to Skinner's motive to implicate Carpenter in exchange for a deal with the State, his admittedly false and incomplete story given during his March 9 meeting with investigators, possible discrepancies between his trial testimony and crime scene evidence, and circumstantial evidence suggesting that Skinner was the murderer.

¶28 After a seven-day jury trial, Carpenter was convicted and subsequently sentenced to a prison sentence of life without parole for Deliberate Homicide and ten years of prison for Tampering with or Fabricating Physical Evidence. Carpenter appeals the District Court's denial of her motions to suppress evidence derived from the search warrants.

¶29 We review an order denying a motion to suppress evidence to determine whether the court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. Burchill*, 2019 MT 285, ¶ 12, 398 Mont. 52, 454 P.3d 633 (citation omitted). A district court's determination regarding whether a search warrant is sufficiently particularized, like jurisdictional determinations, is a legal conclusion we review de novo. *State v. Neiss*, 2019 MT 125, ¶ 14, 396 Mont. 1, 443 P.3d 435; *Ballou v. Walker*, 2017 MT 197, ¶ 12, 388 Mont. 283, 400 P.3d 234.

¶30 On appeal, Carpenter renews her argument that, while there may have been probable cause to search some material on her phone and Facebook account, the warrants authorized a search of substantially all available information and thereby rendered the warrants

10

overbroad, general warrants that violated the particularity requirement found in the Montana and federal constitutions. Carpenter also argues that the District Court erred in failing to suppress information gathered from Carpenter's Facebook account because the warrant was directed to a California corporation and exceeded the court's jurisdiction under §§ 46-5-220(2) and 3-5-312(1), MCA.

¶31 Assuming, without deciding, for the purposes of this Opinion that the District Court did err in declining to suppress the evidence acquired through the challenged warrants, we need not reverse if the alleged error was harmless. *See* § 46-20-701(1), MCA. An error is harmless when there is "no reasonable possibility that the inadmissible evidence might have contributed to the conviction." *State v. Van Kirk*, 2001 MT 184, ¶ 47, 306 Mont. 215, 32 P.3d 735.

¶32 Carpenter argues that the "untainted" evidence presented at trial was ambiguous as to whether Carpenter or Skinner committed the murder and that the evidence obtained from the contested search warrants substantially added to the strength of the State's case. In particular, Carpenter points to the following pieces of evidence: (1) photos of Carpenter's daughter with a black and white "Metal Mulisha" shirt; (2) messages indicating that Carpenter had access to Skinner's Glock; (3) text message records indicating that Carpenter had deleted messages to Skinner from around the time of the murder; and (4) messages suggesting Carpenter feared a custody battle with Gillett.

¶33 First, Carpenter argues that the Facebook photos of her daughter wearing a black and white "Metal Mulisha" shirt supported Skinner's testimony that Gillett had been forced to remove that shirt before his murder, despite evidence showing that Gillett's body had

11

been found wearing a red "Metal Mulisha" shirt. However, the admitted Facebook photos did nothing more than confirm that Carpenter's daughter did indeed have a black and white "Metal Mulisha" shirt. The photos did not corroborate Skinner's testimony that Gillett had been wearing, and been forced to remove, that particular shirt at the time of his death. Moreover, notwithstanding the apparent unlikelihood that Gillett was simultaneously wearing two different "Metal Mulisha" shirts before his death, Gillett's apparel was a minor detail that did not play a significant role in a trial that ultimately turned on whether it was Skinner or Carpenter who shot Gillett. Admission of this evidence was harmless.

¶34   Second, Carpenter argues that admission of her Facebook messages helped the State establish that Carpenter had access to Skinner's Glock, the murder weapon, thereby shifting suspicion from Skinner to Carpenter. However, the State also introduced a photograph of Carpenter posing with Skinner's Glock. This photo was obtained from Skinner's phone and was therefore not subject to the motion to suppress. This image vividly demonstrated Carpenter's access to the murder weapon and was far more persuasive than the challenged Facebook messages making what appear to have been vague references to the gun. The evidentiary value of these messages was merely cumulative and any error in admitting them was harmless.

¶35   Third, Carpenter argues that the admission of her text records showed that she deleted messages between her and Skinner around the time of the murder. However, the State also admitted Carpenter's jailhouse letter to Skinner in which she discussed coming up with a story regarding the deleted messages. Carpenter testified at trial that Skinner and a friend had deleted the messages. Moreover, Carpenter's testimony at trial was that she

had engaged in a lengthy coverup attempt in order to protect Skinner, so evidence that she had deleted text messages at the time of the murder was not harmful to her theory of the case. Thus, admission of the records was harmless. [5]

¶36 Finally, Carpenter points to the Facebook messages suggesting that she feared a custody battle with Gillett, a potential murder motive. However, Skinner testified at trial that he had witnessed Carpenter and Gillett arguing over custody of their child. These Facebook messages were therefore merely cumulative in establishing this potential motive and their admission was harmless.

¶37 The record demonstrates beyond a reasonable doubt that the challenged evidence did not contribute to the conviction. *See Van Kirk*, ¶ 47. Any potentially erroneously admitted evidence was either merely cumulative or played an extremely minor role in Carpenter's seven-day trial. The photo of her with the Glock and other incriminating messages were taken from Skinner's phone. Carpenter's conviction was supported by unrefuted evidence of her numerous coverup attempts and ever-changing alibis. Because admission of the challenged evidence was not prejudicial, we need not determine whether the warrants were insufficiently particularized or outside the District Court's jurisdiction, such that suppression of the resulting evidence would have been required.

¶38 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the

---

[5] Carpenter also argues that she was prejudiced by her text "Hey, I fuckin love you and nothing will change that" to Skinner after Gillett's body was found. However, this text was admitted through Skinner's records, not Carpenter's.

Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶39     Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER
/S/ JIM RICE